# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| IN RE TARGET CORP. SHAREHOLDER DERIVATIVE LITIGATION | ) Lead Case No. 2:25-cv-00021-JLB-KCD<br>)<br>) **JURY TRIAL DEMANDED** |

## VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Portia E. McCollum, as trustee of the McCollum Family Trust; Ryan Murphy; and Chamandeep Kaur (together, "**Plaintiffs**"), by their attorneys, derivatively on behalf of Nominal Defendant Target Corporation ("**Target**" or the "**Company**"), submit this Verified Consolidated Amended Stockholder Derivative Complaint against Defendants Brian C. Cornell ("**Cornell**"), David P. Abney ("**Abney**"), Douglas M. Baker, Jr. ("**Baker**"), George S. Barrett ("**Barrett**"), Gail K. Boudreaux ("**Boudreaux**"), Robert L. Edwards ("**Edwards**"), Donald R. Knauss ("**Knauss**"), Christine A. Leahy ("**Leahy**"), Monica C. Lozano ("**Lozano**"), Grace Puma ("**Puma**"), Derica W. Rice ("**Rice**"), Dmitri L. Stockton ("**Stockton**"), Melanie S. Healey ("**Healey**"), Mary E. Minnick ("**Minnick**"), and Michael J. Fiddelke ("**Fiddelke**") (collectively, the "**Individual Defendants**" and together with Target, "**Defendants**"), who are current and former members of Target's Board of Directors (the "**Board**") and upper management for, *inter alia*, violations of

Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), breach of fiduciary duties, waste of corporate assets, and unjust enrichment.

The Individual Defendants' wrongdoing has caused substantial economic damage to Target as well as damage to Target's reputation, goodwill, and standing in the business community. It has exposed Target to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein also have damaged Target in the form of, among other things, billions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by Target's directors and officers from March 9, 2022, through the present.

The allegations in this complaint are made upon information and belief, except for allegations specifically pertaining to Plaintiffs, which are made upon personal knowledge. This complaint also is based on the investigation of Plaintiffs' counsel, which included, among other things, a review of Target's public filings with the U.S. Securities and Exchange Commission ("**SEC**"), news reports, press releases, securities analysts' reports about the Company, legal filings, and other publicly available sources. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Target is a Minneapolis-based retailer offering "everyday essentials and fashionable, differentiated merchandise at discounted prices" through nearly 2,000 stores nationwide and online.[1] It is the seventh-largest retailer in the United States as of 2024.[2] The Company's stated purpose is "to help all families discover the joy of everyday life."[3]

2.      Target has a long history of promoting various diversity, equity, and inclusion ("**DEI**") and environmental, social, and governance ("**ESG**") causes—ranging from supporting nationwide campaigns to adopting in-store policies and launching products.

3.      Following Cornell's 2014 appointment as Chief Executive Officer ("**CEO**"), Target doubled down on its support of DEI and ESG and embedded them into the Company's strategic business plan and corporate objectives.

4.      Over the past decade, the Company has hosted a number of social activism initiatives during Pride Month, the annual celebration of the LGBTQIA+ community in June.[4]

---

[1] Target Corporation, Annual Report (Form 10-K) (Mar. 13, 2024).

[2] *Top 100 Retailers 2024 List*, Nat'l Retail Fed'n, https://nrf.com/research-insights/top-retailers/top-100-retailers/top-100-retailers-2024-list (last visited July 28, 2025).

[3] Target Corporation, Annual Report (Form 10-K) (Mar. 13, 2024).

[4] "**LGBTQIA+**" refers to "Lesbian, Gay, Bisexual, Transgender, Queer or Questioning, Intersex, and Asexual/Aromantic. The "+" represents the many other identities that may be part of the community such as pansexual, agender, non-binary, gender fluid, etc., as well as allies of the community." *See* University of Utah Respect & Belonging Style Guide,

5.      For example, in June 2015, Target launched a campaign to honor Pride Month, which included the publication of a "Pride Manifesto" with an accompanying video transcript.[5] The following year, Target announced its opposition to a North Carolina transgender bathroom law, stating that its employees and customers could use any bathroom or fitting room that conformed with their gender self-identity.[6]

6.      Target faced immediate, significant backlash from customers, shareholders, consumer groups, and influencers, who warned that continuing with similar initiatives could harm Target's business. In response to Target's stance on the North Carolina bathroom law, in particular, one million customers boycotted the Company.[7] The boycott had both immediate and lasting effects on Target including three consecutive quarters of declining sales after opposing the North Carolina law, and reports indicated a noticeable decline in foot traffic.[8]

---

https://brand.utah.edu/communications/belonging-style-guide/. This complaint uses the term LGBTQIA+ except in direct quotations, which may use a variation such as LGBT or LGBTQ.

[5] Adele Chapin, *Target Aligns Itself More Strongly with the LGBT Community*, Racked (Sept. 10, 205), https://www.racked.com/2015/9/10/9306249/target-equality-act.

[6] Hayley Peterson, *The Target Boycott is Spiraling Out of Control*, BUS. INSIDER (Apr. 26, 2016), https://www.businessinsider.com/the-target-boycott-is-spiraling-out-of-control-2016-4.

[7] Dana Farrington, *Petition Calls for Boycott of Targets 'Inclusive' Bathroom Policy*, NPR (Apr. 25, 2016), https://www.npr.org/sections/thetwo-way/2016/04/25/475624646/petition-calls-for-boycott-of-targets-inclusive-bathroom-policy.

[8] Hayley Peterson, *The Target Boycott is Costing More Than Anyone Expected*, BUS. INSIDER (Aug. 24, 2016), https://www.businessinsider.com/target-boycott-costs-20-million-2016-8.

7.     In May 2023, Target embarked upon the most extensive and prominent Pride Month campaign in the Company's history (the "**2023 Pride Campaign**").[9]  Promotional displays were conspicuously placed at the front of stores nationwide.   The Company offered over 2,000 Pride Month-themed products, including "gender fluid mugs, queer all year calendars, and books for children aged 2-8 titled *Bye Bye, Binary*, *Pride 1,2,3*, and *I'm not a girl*[,]"[10] Additional offerings included books titled *Are You a Boy or a Girl?* and *The Hips on the Drag Queen Go Swish, Swish, Swish*.[11]

8.     Other products included a slogan sweater with the words "cure transphobia not trans people" and a tote bag that said, "too queer for here."[12] Target's 2023 Pride Campaign even offered merchandise "with images of pentagrams, horned skulls and other Satanic products," extra-extra-small "swimsuits with clothing tags that describe the items as having a 'light binding

---

[9] *See* Nathaniel Meyersohn, *Target Removing Some Pride Merchandise After Anti-LGBTQ Threats Against Staff*, CNN (May 25, 2023), https://www.cnn.com/2023/05/23/business/target-lgbtq-merchandise/index.html.

[10] *Id.*

[11] Brody Levesque, *Target Moves Pride Merchandise to Back of Stores in Some Southern States* (May 24, 2023), WASHINGTON BLADE https://www.washingtonblade.com/2023/05/24/target-moves-pride-merchandise-to-back-of-stores-in-some-southern-states/.

[12] Siddharth Cavale, *Target Removing Some LGBTQ Merchandise Following Customer Backlash*, REUTERS (May 24, 2023), https://www.reuters.com/business/retail-consumer/target-remove-some-lbgtq-merchandise-after-facing-customer-backlash-2023-05-23/.

effect' on breasts and 'tuck-friendly construction' for male genitalia" with "extra crotch coverage."[13]

9.    Consumers across the country were outraged by Company's 2023 Pride Campaign and boycotted Target, causing the Company to lose at least $10 billion in market capitalization between May 18, 2023, and May 23, 2023, leading the stock to experience its longest losing streak in 23 years.[14]

10.    Despite the Company's assurances that it was overseeing and disclosing risks stemming from its ESG and DEI initiatives, the Company repeatedly failed to disclose the significant risk of consumer boycotts – and a resulting loss of profits, shareholder value, goodwill, and other intangible harm – that could result from its embrace of social policies to which a substantial portion of its customers took exception.

11.    On May 24, 2023, the Company issued a "Target Statement on 2023 Pride Collection," publicly acknowledging the extent of the backlash to the 2023 Pride Campaign and announcing that Target was making "adjustments" and removing items from its shelves.[15]

---

[13] *Id.*

[14] Ronny Reyes, *Target Loses $10B in 10 Days as Stock Falls Following Boycott Over LGBTQ-Friendly Kids Clothing*, N.Y. Post (May 28, 2023), https://nypost.com/2023/05/28/target-loses-10b-following-boycott-calls-over-lgbtq-friendly-clothing/.

[15] *Target Statement on 2023 Pride Collection,* Target (May 24, 2023), https://corporate.target.com/press/statement/2023/05/target-statement-on-2023-pride-collection.

12.    On this news, the Company's stock price fell $20.21 per share, or approximately 14%, to close at $140.75 on May 25, 2023. By June 14, 2023, Target's stock price dropped even further, closing at $124.12 per share.

13.    Ultimately, in addition to suffering significant reputational damage, the Company lost approximately $25 billion in market capitalization during the second half of 2023 as a result of its failure to disclose the known risk of widespread consumer boycotts in response to its 2023 Pride Campaign.

14.    As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact concerning, *inter alia*, the risks the Company faced related to its DEI and ESG initiatives. Specifically, the Individual Defendants failed to disclose to investors that: (i) Target was subject to the risk of consumer boycotts and reduced profits because of its ESG and DEI initiatives, such as the 2023 Pride Campaign; (ii) the Board and Company management were not conducting proper oversight and had not established sufficient controls or reporting systems over the risks associated with Target's DEI and ESG initiatives; (iii) the Company's ESG and DEI initiatives were not implemented to maximize shareholder value; (iv) the consumer boycotts following the 2023 Pride

Campaign were more serious than the Company was letting on; and (v) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

15.    In further breach of their fiduciary duties, the Individual Defendants failed to establish or maintain adequate controls or reporting systems, and separately caused target to repurchase over a billion dollars of its own common stock at prices they knew were artificially inflated due to the false and misleading statements they issued or allowed to be issued.

16.    As a result of the foregoing, Target and the Individual Defendants are named as defendants in a related securities action, captioned *Craig v. Target Corporation, et al.*, Case No. 2:23-cv-00599-JLB-KCD (M.D. Fla.), wherein this Court denied Defendants' motion to dismiss, finding, *inter alia*, that the plaintiffs had stated actionable claims for knowing violations of the federal securities laws, thereby exposing Target and the Individual Defendants to financial harm and substantial risk of liability in that action. Target and the Individual Defendants are also named as defendants in two securities class actions pending in this Court, captioned *City of Riviera Beach Police Pension Fund v. Target Corporation, et al.*, Case No. 2:25-cv-00085-JLB-KCD (M.D. Fla.) and *State Board of Administration of Florida v. Target Corporation, et al.*, Case No. 2:25-cv-00135-JLB-KCD (M.D. Fla.). On July 24, 2025, this Court

consolidated these three securities actions into a single action *sub nom*. *In re Target Corp. Securities Class Action Litigation*, Case No. 2:25-cv-00135-JLB-KCD (the "**Securities Class Action**").

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act because Plaintiffs' claims raise federal questions under Section 14(a) of the Exchange Act (15 U.S.C. §78n(a)(1)), Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1).  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

18.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

19.    The court has personal jurisdiction over each Defendant named herein because each is either a corporation that conducts business in and maintains operations in this District or an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391(b)(1) because a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District. Moreover, the Company and the Individual Defendants have been involved in business in this District and the Individual Defendants' actions have had an effect in this District. The Securities Class Action is also pending in this District.

## PARTIES

### Plaintiffs

21.     Plaintiff Portia McCollum is trustee of the McCollum Family Trust, which has continuously owned shares Target common stock at all times since at least November 2017. Plaintiff McCollum understands the McCollum Family Trust's obligation to hold its Target common stock throughout the pendency of this action and is prepared to ensure it does so. On behalf of the McCollum Family Trust, Plaintiff McCollum will fairly and adequately represent the interests of Target and Target's shareholders in enforcing the rights of the Company.

22.     Plaintiff Ryan Murphy has continuously owned shares of Target common stock at all times since at least August 2006. Plaintiff Murphy understands his obligation to hold his Target common stock throughout the pendency of this action and is prepared to do. Plaintiff Murphy will fairly and

10

adequately represent the interests of Target and Target's shareholders in enforcing the rights of the Company.

23.     Plaintiff Chamandeep Kaur has continuously owned shares of Target common stock at all times since at least 2019. Plaintiff Kaur understands his obligation to hold his Target common stock throughout the pendency of this action and is prepared to do. Plaintiff Kaur will fairly and adequately represent the interests of Target and Target's shareholders in enforcing the rights of the Company.

**Nominal Defendant**

24.     Nominal Defendant Target is a Minnesota corporation with its principal executive offices located in Minneapolis, Minnesota. Target's common stock trades on the New York Stock Exchange ("**NYSE**") under the ticker symbol "TGT."

**Current Director Defendants**

25.     Defendant Cornell has served as Target's CEO and Chairman of the Board since August 2014. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Cornell received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|------|---------------------|
| 2021 | $19,758,766 |
| 2022 | $17,664,896 |
| 2023 | $19,203,353 |

| 2024 | $20,407,603 |
| **TOTAL:** | **$77,034,618.00** |

26.     Defendant Abney has served as a member of the Board since 2021.
He is currently a member of the Audit & Risk Committee and the
Infrastructure & Finance Committee. As set forth in the Company's annual
proxy statements filed with the SEC, Defendant Abney received the following
compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
| --- | --- |
| 2021 | $197,689 |
| 2022 | $310,113 |
| 2023 | $310,058 |
| 2024 | $310,074 |
| **TOTAL:** | **$1,127,934.00** |

27.     Defendant Baker has served as a member of the Board since 2013.
He is currently a member of the Compensation & Human Capital Management
Committee and the Governance & Sustainability Committee. As set forth in
the Company's annual proxy statements filed with the SEC, Defendant Baker
received the following compensation from the Company between 2021 and
2024:

| Year | Total Compensation |
|---|---|
| 2021 | $325,027 |
| 2022 | $335,113 |
| 2023 | $335,128 |
| 2024 | $310,074 |
| TOTAL: | $1,305,342.00 |

28.    Defendant Barrett has served as a member of the Board since 2018. He is currently Chair of the Governance & Sustainability Committee and a member of the Compensation & Human Capital Management Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Barrett received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $295,114 |
| 2022 | $310,071 |
| 2023 | $326,693 |
| 2024 | $335,114 |
| TOTAL: | $1,266,992.00 |

29.    Defendant Boudreaux has served as a member of the Board since 2021. She is currently a member of the Audit & Risk Committee and the Infrastructure & Finance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Boudreaux received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $172,992 |
| 2022 | $310,071 |
| 2023 | $310,026 |
| 2024 | $310,113 |
| **TOTAL:** | **$1,103,202.00** |

30.    Defendant Edwards has served as a member of the Board since 2015. He is currently a member of the Audit & Risk Committee, on which he served as Chair until June 2024. He is also a member of the Infrastructure & Finance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Edwards received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $325,027 |
| 2022 | $335,113 |
| 2023 | $335,058 |
| 2024 | $320,491 |
| **TOTAL:** | **$1,315,689.00** |

31.    Defendant Knauss has served as a member of the Board since 2015. He is currently Chair of the Infrastructure & Finance Committee and a member of the Compensation & Human Capital Management Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Knauss received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $295,027 |
| 2022 | $326,780 |
| 2023 | $335,058 |
| 2024 | $335,074 |
| **TOTAL:** | **$1,291,939.00** |

32.    Defendant Leahy has served as a member of the Board since 2021. She is currently a member of the Compensation & Human Capital Management Committee and the Governance & Sustainability Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Leahy received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $295,027 |
| 2022 | $310,071 |
| 2023 | $310,026 |
| 2024 | $313,030 |
| **TOTAL:** | **$1,228,154.00** |

33.    Defendant Lozano has served as a member of the Board since 2016 and as Lead Independent Director since 2021. She is currently Chair of the Compensation & Human Capital Management Committee and a member of the Governance & Sustainability Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Lozano received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $335,027 |
| 2022 | $370,113 |
| 2023 | $370,058 |
| 2024 | $370,074 |
| TOTAL: | $1,445,272.00 |

34.    Defendant Puma has served as a member of the Board since 2022. She is currently a member of the Audit & Risk Committee and the Infrastructure & Finance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Puma received the following compensation from the Company for the years 2022 and 2024:

| Year | Total Compensation |
|---|---|
| 2022 | $205,162 |
| 2023 | $310,026 |
| 2024 | $310,074 |
| TOTAL: | $825,262.00 |

35.    Defendant Rice has served as a member of the Board since 2020. He is currently a member of the Audit & Risk Committee and the Infrastructure & Finance Committee. Defendant Rice also previously served on the Board from September 2007 to January 2018. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Rice received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $295,144 |
| 2022 | $310,071 |
| 2023 | $310,026 |
| 2024 | $310,113 |
| TOTAL: | $1,225,354.00 |

36.    Defendant Stockton has served as a member of the Board since 2018. He is currently Chair of the Audit & Risk Committee and a member of the Governance & Sustainability Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Stockton received the following compensation from the Company between 2021 and 2023:

| Year | Total Compensation |
|---|---|
| 2021 | $295,144 |
| 2022 | $310,071 |
| 2023 | $310,026 |
| 2024 | $326,780 |
| TOTAL: | $1,242,021.00 |

37.     Collectively, Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma, Rice, and Stockton may be referred to herein as the "**Current Director Defendants**."

### Former Director Defendants

38.     Defendant Healey served as a member of the Board from 2015 until June 2023. Prior to her departure from the Board, she was a member of the Compensation & Human Capital Management Committee and the Governance & Sustainability Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Healey received the following compensation from the Company between 2021 and 2023:

| Year | Total Compensation |
|------|--------------------|
| 2021 | $295,027 |
| 2022 | $310,113 |
| 2023 | $240,058 |
| **TOTAL:** | **$845,198** |

39.     Defendant Minnick served as a member of the Board from 2005 until June 8, 2022.  Prior to her departure from the Board, she was Chair of the Infrastructure & Finance Committee. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Minnick received the following compensation from the Company for the years 2021 and 2022:

| Year | Total Compensation |
|---|---|
| 2021 | $312,537 |
| 2022 | $335,188 |
| **TOTAL:** | **$647,725** |

40.    Together, Defendants Healey and Minnick may be referred to herein as the "**Former Director Defendants**." The Current Director Defendants and the Former Director Defendants may be referred to herein as the "**Director Defendants**."

**Officer Defendant**

41.    Defendant Fiddelke has served as the Company's Executive Vice President and Chief Operating Officer ("**COO**") since February 2024 and as the Company's Chief Financial Officer ("**CFO**") since November 2019. He has worked in various roles since he joined the Company as an intern in 2003. As set forth in the Company's annual proxy statements filed with the SEC, Defendant Fiddelke received the following compensation from the Company between 2021 and 2024:

| Year | Total Compensation |
|---|---|
| 2021 | $4,226,734 |
| 2022 | $4,330,602 |
| 2023 | $4,866,218 |
| 2024 | $6,741,443 |
| **TOTAL:** | **$20,164,997.00** |

42.    Defendant Fiddelke and Defendant Cornell together may be referred to herein as the "**Officer Defendants**."

## SUBSTANTIVE ALLEGATIONS

51.    Founded in 1902 as the Goodfellow Dry Goods Company, Target is now one of the largest retailers in the United States, offering a variety of merchandise at nearly 2,000 retail stores throughout the country, as well as through its online platform, Target.com. Over the years, Target painstakingly built a reputation for providing a combination of quality, style, and affordability.

52.    The majority of the Company's stores are larger than 170,000 square feet (three football fields) and offer a wide assortment of general merchandise and a full line of food items. Target's digital channels also offer a wide range of merchandise, including items not found in stores and items sold by third parties.

53.    The Company's five core merchandise categories are: (i) Apparel & Accessories; (ii) Food & Beverage; (iii) Home Furnishings & Décor; (iv) Beauty & Household Essentials; and (v) Hardlines.

54.    In August 2014, Defendant Cornell became "the first outsider ever tapped to lead the [C]ompany in its more than 100-year history"[16] and, shortly thereafter, Target began to emphasize ESG and DEI initiatives in its business

---

[16] TCB Staff, *Target CEO Brian Cornell is TCB's 2019 Person of the Year*, Twin Cities Bus. (Sept. 16, 2019), https://tcbmag.com/target-ceo-brian-cornell-is-tcba%C2%80%C2%99s-2019-person-of-the-year/.

and corporate culture, with the stated purpose of benefitting various Company

"stakeholders."

55.    In 2019, Defendant Cornell, in his capacity as the Chairman and

CEO of Target, signed the Business Roundtable's "Statement on the Purpose

of a Corporation" (the "**BRT Statement**"), in which he pledged to make "a

fundamental commitment to <u>all</u> of our stakeholders," noting that "[e]ach of our

stakeholders is essential," and that Target was committed "to deliver[ing]

value to all of them."[17]

56.    Although corporate law traditionally requires that directors give

shareholder interests primacy over those of other stakeholders, Target has

explicitly stated that the Board's "governance and management systems…

fully implement the [BRT] Statement of Purpose." Indeed, the Company went

so far as stating that the Board's "ongoing consideration of various

stakeholders in its governance decisions and oversight of the Company's

business and strategy" was "core to the Company's governance." Indeed, the

Company's Annual Reports filed with the SEC have noted, since at least 2022,

---

[17] *See Business Roundtable Redefines the Purpose of a Corporation to Promote 'An Economy That Serves All Americans,'* Bus. Roundtable (Aug. 19, 2019), https://www.businessroundtable.org/business-roundtable-redefines-the-purpose-of-a-corporation-to-promote-an-economy-that-serves-all-americans.

that Target's "corporate purpose is to help all families discover the joy of everyday life."[18]

57.     Nearly all of Target's initiatives addressing "stakeholder" interests align closely with progressive stances on ESG and DEI issues. For example: (i) in 2020, Target committed to an expressly race-based hiring plan by pledging to "increase representation of Black team members across the Company by 20 percent" over three years;[19] (ii) after the United States Supreme Court's 2022 decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 515 (2022), Target expanded its employee-benefit plans to compensate employees for out-of-state travel necessary to obtain abortions;[20] and (iii) Target welcomes employees and guests to "use the restroom or fitting room facility that corresponds with their gender identity."[21]

---

[18] *See, e.g.*, Target Corporation, Annual Report (Form 10-K) (Mar. 13, 2024).

[19] *Target Releases Workforce Diversity Report; Plans to Increase Representation of Black Team Members Across the Company by 20 Percent Over Three Years*, Target (Sept. 10, 2020), https://corporate.target.com/press/release/2020/09/target-releases-workforce-diversity-report-plans-t.

[20] Melissa Repko, *Target Will Cover Employees' Travel to Other States for Abortions, Company Memo Says*, CNBC (Jun. 28, 2022), https://www.cnbc.com/2022/06/28/target-will-cover-employees-travel-to-other-states-for-abortion.html.

[21] Robert Mclean, *Target Says Transgender Customers Can Use Bathroom That Matches Their Gender Identity*, CBS News (Apr. 20, 2016), https://www.cbsnews.com/philadelphia/news/target-says-transgender-customers-can-use-bathroom-that-matches-their-gender-identity/.

## **Target's LGBTQIA+ Activism Consistently Provokes Backlash**

58.    For over a decade, Target has actively supported the LGBTQIA+ community in particular, partnering with a number of LGBTQIA+  activist groups to promote ESG and DEI initiatives and earning a reputation as a corporation with "forward-looking policies and benefits for gay and lesbian employees." Target also has touted its "PRIDE+ Business Council," a group of Target employees who work to "represent[]… the LGBTQIA+ community at Target."

59.    In 2012, Target launched its first reported LGBTQIA+-themed merchandise and announced it would donate the sales proceeds to the Family Equality Council,[22] a group that "has provided LGBTQ+ families with community, support, advocacy, and storytelling for more than 45 years."[23] Merchandise included shirts in rainbow-hued designs bearing slogans such as "Love is love" and "Harmony."

60.    In response, Tony Perkins, the President of the Family Research Council, a group promoting a "biblical worldview" and the host of a daily, nationally-syndicated radio show, *Washington Watch with Tony Perkins*, stated that Target's campaign was not "'very smart,' especially in conservative

---

[22] Janet Moore, *Line of Target T-shirts to Support Gay Pride*, The Minn. Star Trib. (May 22, 2012), https://www.startribune.com/line-of-target-t-shirts-to-support-gay-pride/152818315.

[23] *See Our History*, Fam. Equal., https://familyequality.org/our-history/ (last visited Jul. 28, 2025).

states, where [Target] does the biggest business" and called on his listeners to "Let Target know that its agenda isn't your style. Log on to target.com, scroll down, and click 'Contact Us.'"

61.    The American Family Association, a group promoting "biblical, family values in society and government," released an "action alert" stating "Target is joining President Obama in ramming same-sex marriage down the throats of the American people" and calling on readers to "[s]end an email to Target['s] Chairman" to "[l]et him know that a majority of Americans oppose same-sex marriage and are able to use their pocketbooks to voice their opposition to companies that support it."

62.    In August 2014, after having previously remained neutral on the issue, Target announced that it had signed an amicus brief "in support of marriage equality."[24] In response, a number of groups opposed to same-sex marriage organized a consumer protest and urged consumers to boycott the Company.

63.    In June 2015, Target launched its Pride Month campaign, titled "#TakePride," which consisted of a line of apparel and accessories with the

---

[24] *Target Signs Amicus Brief on Marriage Equality*, Target (Aug. 5, 2014), https://corporate.target.com/news-features/article/2014/08/target-signs-amicus-brief-marriage-equality?clkid=8d5d3465N3a9f11eda8fea3d0c33f3305&cpng=PTID1&lnm=81938&afid=intentX%20Inc.&ref=tgt_adv_xasd0002.

Company's logo in rainbow hues.[25] Also in June 2015, the Company posted a

"Pride Manifesto" to its website, which has since been removed.[26]

64.    The Company also announced in June 2015 that it was partnering

with the Gay, Lesbian and Straight Education Network ("**GLSEN**"), a group

that seeks to "creat[e] affirming environments for LGBTQ+ youth" by

"activating supportive educators" and "centering and uplifting student-led

movements,"[27] to produce "a mini-documentary highlighting the work of

students, educators and volunteers who have improved school climate for

lesbian, gay, bisexual and transgender (LGBT) youth across the country."[28]

65.    In August 2015, Target announced that it would phase out

"gender-based signage" on children's toys and other merchandise because

"guests have raised important questions about a handful of signs in our stores

based on gender."[29]

---

[25] Cory Fernandez, *Daily Crush: #TakePride Campaign by Target*, Out (Jun. 9, 2015), https://www.out.com/truman-says/2015/6/09/target-launches-takepride-campaign-pride-month?page=10#toggle-gdpr.

[26] Chapin, *supra*.

[27] *See About Us*, GSLEN, https://www.glsen.org/about-us (last visited July 28, 2025).

[28] *GLSEN and Target Team Up for 25th Anniversary Documentary*, GLSEN (June 2, 2015), https://www.glsen.org/news/glsen-and-target-team-25th-anniversary-documentary.

[29] Kathryn Robinson, *Target Ditches Gender Labels on Toys, Home, and Entertainment*, NBC News (Aug. 9, 2015), https://www.nbcnews.com/news/us-news/target-ditches-gendered-labels-toys-home-entertainment-n406741.

66.    Social and political commentators again called on consumers to respond. The Reverend Franklin Graham, for example, published a Facebook post that was liked by over 102,000 users, urging his followers to let Target "know that you are perfectly willing to shop where the genders God created are appreciated."

67.    In September 2015, Target announced that it had signed on in support of the "Equality Act,"[30] which sought to amend the Civil Rights Act of 1964 "to include sex, sexual orientation, and gender identity among the prohibited categories of discrimination or segregation in places of public accommodation."[31] Among other things, this proposed legislation would codify "gender identity" as "gender-related identity, appearance, mannerisms, or characteristics, regardless of the individual's designated sex at birth," prohibit "the Religious Freedom Restoration Act of 1993 from providing a claim, defense, or basis for challenging" gender identity in the workplace, and "[p]rohibit[] an individual from being denied access to a shared facility, including a restroom, a locker room, and a dressing room, that is in accordance with the individual's gender identity."[32]

---

[30] *Stronger Together: Target Signs on in Support of the Equality Act*, Target (Sept. 10, 2015), https://corporate.target.com/news-features/article/2015/09/equality-act.

[31] H.R. 3185, 114th Cong. (2015-2016).

[32] *Id.*

68.    In 2015 and 2016, Target was named a "platinum" National Corporate Partner of the Human Rights Campaign ("**HRC**"),[33] a LGBTQIA+ advocacy group. Additionally, Target received a 100 on HRC Foundation's Corporate Equality Index, a national benchmarking tool on corporate policies and practices pertinent to LGBTIA+ employees.

69.    In April 2016, after North Carolina enacted legislation limiting multi-occupancy bathrooms and locker rooms to occupants of the same sex as defined on their birth certificates, Target responded to calls for action from LGBTQIA+ stakeholders by publishing a blog post responding to "proposed laws in several states," and declared that Target welcomed "transgender team members and guests to use the restroom or fitting room facility that corresponds with their gender identity."[34]

70.    The backlash was swift and caused significant losses for the Company. Within weeks, more than 550,000 people signed a pledge to boycott

---

[33] Beck Bailey, *Target Affirms Trans-Inclusive Policies, Makes Powerful Statement During Surge of Anti-LGBT Bills*, Hum. Rts. Campaign (Apr. 20, 2016), https://web.archive.org/web/20160423090807/http://www.hrc.org/blog/target-affirms-trans-inclusive-policies-makes-powerful-statement-during-sur;National *Corporate Partners*, Hum. Rts. Campaign, https://web.archive.org/web/20160415030632/http://hrcnationaldinner.org/sponsors/partners.

[34] Stephen Peters, *More Than 100 Major CEOs & Business Leaders Urge North Carolina to Repeal Anti-LGBT Law*, Hum. Rts. Campaign (Mar. 31, 2016), https://www.hrc.org/press-releases/more-than-100-major-ceos-business-leaders-demand-north-carolina-repeal-radi; *Continuing to Stand for Inclusivity*, Target (Apr. 19, 2016), https://corporate.target.com/news-features/article/2016/04/target-stands-inclusivity.

Target.[35] Ultimately, more than 1.5 million people pledged to boycott Target in response to its transgender bathroom policy, and a number of protesters attended the Company's June 2016 shareholder meeting to speak out against the policy.[36] The Company's sales fell 7.2% for the quarter, and same-store sales growth declined in each of the three quarters following the Company's publication of the blog post – the first such decline in years. The boycotts also resulted in the value of Target's stock falling more than 35%.[37]

71.    In addition to declining sales growth, Target was forced to "spend $20 million to add private bathrooms to the stores that didn't have them" and "embark[] on a multibillion-dollar revamp" of the stores that were falling behind as a result.[38] After an internal review, Target executives determined that the 2016 boycott "was the tipping point for [closing] some stores" in several markets.

72.    Although Defendant Cornell publicly defended the decision to publish the transgender bathroom blog post, he reportedly admitted to Target

---

[35] Farrington, *supra*.

[36] *See American Family Association Meets with Target Senior Management About Its War on Women and Girls; Delivers One Million Petition Signatures*, AFA (May 12, 2016), https://www.afa.net/who-we-are/press-releases/2016/05/american-family-association-meets-with-target-senior-management-about-its-war-on-women-and-girls-delivers-one-million-petition-signatures/.

[37] Elena Cherubini, *Target Doubles Down on Pride Celebrations Despite Anti-LGBT Boycott*, LGBTQ+ Inst. (May 15, 2017), https://www.lgbtqinstitute.org/news/2017/5/15/target-doubles-down-on-pride-celebrations-despite-anti-lgbt-boycott.

[38] *Id.*

staff that the Company "didn't adequately assess the risk, and the ensuring backlash was self-inflicted." He maintained, however, that "it was too late to reverse course."

73.    Target has continued to host Pride Month campaigns and offer Pride-themed merchandise every year, despite this "self-inflicted" backlash and declines in Target's stock price during Pride Month in three of the last four years.

74.    In 2017, for example, the Company again launched a Pride Month campaign with similar products to those offered during the 2016 #TakePride campaign. Coming on the heels of the bathroom policy, this 2017 campaign was likewise controversial, with one critic stating the following:

> 'I would think Target would have learned their lesson about participating in aggressive LGBT activism from the backlash they received from their open bathroom policy last year, yet they seem not to have learned that lesson,' said Peter Sprigg, of Family Research Council (FRC).

> 'They don't understand that those people who signed up to boycott Target are not going to be any happier with the Take Pride merchandise that they're offering.'[39]

75.    Nevertheless, the Company's Pride Month campaigns continued to grow in size. In 2020, the Company launched a robust pride campaign, which

---

[39] *Target at it Again, Pushing Pro-LGBT Agenda*, The Christian Broad. Network (May 12, 2017), https://cbn.com/news/us/target-it-again-pushing-pro-lgbt-agenda.

included a collection of more than 90 products that were sold online and in
nearly 500 stores across the country. The Company also disclosed that Target's
Pride+ Business Council had planned internal programming for employees—
including online panels, team member testimonials, and more—to help the
Company's team members come together to observe Pride Month. Target also
donated $100,000 to GLSEN.[40]

76.    In November 2020, following complaints from activists on Twitter
(now X), Target ceased selling two books—*Irreversible Damage: The
Transgender Craze Seducing Our Daughters* by Abigail Shrier and *The End of
Gender: Debunking the Myths about Sex and Identity in Our Society* by Debra
Soh—that were skeptical of transgenderism. The decision sparked significant
public backlash over censorship concerns, leading Target to reverse course and
reinstate the books the following day.[41]

77.    The books, however, were later removed again from Target.com in
2021, aligning with the Company's new Book Content Guidelines, which allow
for the exclusion of content deemed potentially harmful to individuals or

---

[40] *Here's How Target's Helping Guests and Team Members Honor Pride Month*, Target (June 11, 2020),
https://corporate.target.com/news-
features/article/2020/06/pride?clkid=8d5d3465N3a9f11eda8fea3d0c33f3305&cpng=PTID1&ln
m=81938&afid=intentX%20Inc.&ref=tgt_adv_xasd0002.

[41] Charles Bowyer & Jerry Bowyer, *Target Hits Books*, Nat'l Rev. (Jul. 30, 2021),
https://www.nationalreview.com/2024/12/motivated-reasoning-has-no-home-
here/?utm_source=onsite&utm_medium=nri&utm_campaign=december&utm_term=geraghty.

groups based on factors like gender identity (including content that could promote harmful stereotypes or medical misinformation without historical context). These guidelines, which were introduced without any apparent press notification or formal announcement,[42] were published on Target's corporate website under the sustainability and governance section and state, in relevant part:

> As a bookseller, our assortment represents the varied and diverse perspectives of our guests. However, we can decide not to sell certain content, including pornography, erotica, sexually explicit content, obscenity, some forms of satire, or other inappropriate content, and any content that is illegal, infringing, harmful or potentially harmful.

> Harmful or potentially harmful content is defined as:

> - Content that has the potential to cause harm to an individual or group of people based on race, ethnicity, national origin, sex, sexual orientation, gender, gender identity, religion, or disability, including content that could incite violence, harmful stereotypes or derogatory language, statements of inferiority, medical misinformation, or calls for exclusion or segregation without any historical context or significance. Target reserves the right to make a determination on the historical value of the item....[43]

---

[42] *Id.*

[43] *Book Content Guidelines*, Target, https://corporate.target.com/sustainability-governance/responsible-supply-chains/suppliers/book-content-guidelines (last visited July 24, 2024).

78.    This book ban and Target's new Book Content Guidelines resulted in further backlash.[44]

79.    Target, however, continued pushing its DEI initiatives. In 2021, Target launched its Pride Month campaign in June, which consisted of "over 150 inclusive products available in all stores and on Target.com. (Hint: It offers *even more* ways to help you celebrate at home, with home décor like decorative lights and scented candles on top of our guest-favorite apparel assortment)." Target again donated $100,000 to GSLEN, as well as donating and volunteering time to other organizations, including HRC. Furthermore, the Pride+ Business Council facilitated opportunities and events for the Company's team members.[45]

80.    Target's 2021 Pride Month collection again received customer backlash, with some critiquing the aesthetics of the collection and others alleging that Target missed the mark entirely on the LGBTQIA+ messaging. Some customers called the collection homophobic and "out of touch." Many customers critiqued one of the Company's T-shirts, listed on Target.com as a

---

[44] Bowyer, *supra*; Madeline Osburn, *Target Swiftly Bans Books on Behalf of Anonymous Twitter User Crying 'Transphobia,'* The Federalist (Nov. 13, 2020), https://thefederalist.com/2020/11/13/target-swiftly-bans-book-on-behalf-of-anonymous-twitter-user-crying-transphobia/.

[45] *Take Pride! Here's How Target's Recognizing Pride Month*, Target (June 2, 2021), https://corporate.target.com/news-features/article/2021/06/pride.

"Pride Gender Inclusive Adult 'Pronouns' Short Sleeve Graphic T-Shirt," with one critic calling it "an invitation for 'allies' to misgender you on accident."[46]

81.    In 2022, Target attempted to revamp its Pride Month initiatives and announced that it teamed up with LGBTQIA+ designers, entrepreneurs, and Target team members to design the Pride Month collection. The collection was launched online and in stores and included 250+ items that were marketed as "designed by and for the LGBTQIA+ community." Target's Pride+ Business Council also put together a full lineup of Pride Month events.[47]

82.    The 2022 Pride Month campaign received a more positive response than the 2021 collection, with *Refinery 29* reporting that the collection was "Queer Tik Tok approved."[48]

83.    Additionally, in 2022, Target donated $250,000 to GLSEN, which marked the 11th year of partnership between the two entities and $2.1 million total donated since the beginning of the partnership.[49]

---

[46] Palmer Haasch, *TikTok Users are Roasting Pride Month Merchandise from Giant Corporations*, Targeting 'Rainbow Capitalism,' Bus. Insider (May 4, 2021), https://www.businessinsider.com/target-pride-month-collection-tiktok-ratings-2021-5; Gabriela Garcia-Astolfi, *Why Target Revamped Its 2022 Pride Collection After Criticism*, Glossy (Jun. 24, 2022), https://www.glossy.co/fashion/why-target-revamped-its-2022-pride-collection-after-criticism/.

[47] *Here's How Target's Celebrating Pride Month This June – and All Year*, Target (June 1, 2022), https://corporate.target.com/news-features/article/2022/06/pride#:~:text=Target%20donated%20$250%2C000%20donation%20to%20GLSEN%20to,accessible%20and%20antiracist%20spaces%20for%20LGBTQIA+%20student.

[48] Garcia-Astolfi, *supra*.

[49] Meyersohn, *supra*.

33

84.     Notwithstanding management's previously admitted "self-inflicted" failure to adequately assess the risk of backlash, Target dramatically expanded its LGBTQIA+ activism with its 2023 Pride Campaign – and failed to warn shareholders of the corresponding risk for severe reputational and financial damage to the Company.

**Target Issues Materially False & Misleading Statements Prior to Launching the 2023 Pride Campaign**

85.     Throughout 2022 and 2023, the Individual Defendants issued and caused the Company to issue materially false and/or misleading statements and failed to disclose material adverse facts regarding the Company's DEI and ESG initiatives, and the 2023 Pride Month campaign specifically.

86.     For example, the Company did not disclose to stockholders the known risk of adverse customer and stockholder reactions to its ESG and DEI initiatives, and the LGBTQIA+ initiatives specifically. Instead, the Company posed any potential risks to the Company from its ESG and DEI initiatives as merely hypothetical, and assured investors that the Individual Defendants were overseeing ESG risks to the Company.

87.     On March 9, 2022, Target filed its Annual Report on Form 10-K (the "**2021 10-K**") with the SEC. With regard to the risks stemming from the Company's ESG and DEI initiatives, the 2021 10-K stated, in relevant part, as follows:

**Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members.**

We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the reputation we have built over many years for serving those constituencies and the communities in which we operate. To be successful in the future, we must continue to preserve Target's reputation. Our reputation is based in large part on perceptions, both about us and others with whom we do business, and broad access to social media makes it easy for anyone to provide public feedback that can influence perceptions of Target. It may be difficult to control negative publicity, regardless of whether it is accurate. Target's responses to crises and our position or perceived lack of position on environmental, social, and governance (ESG) matters, such as sustainability, responsible sourcing, and diversity, equity, and inclusion (DE&I), and any perceived lack of transparency about those matters, could harm our reputation. While reputations may take decades to build, ***negative incidents involving us or others with whom we do business can quickly erode trust and confidence and can result in consumer boycotts, workforce unrest or walkouts, government investigations, or litigation.*** For example, we have a limited ability to end our relationship with CVS, which leases space to operate their clinics and pharmacies within our stores. If our guests have negative experiences with or unfavorably view CVS or other companies with whom we have relationships, it could cause them to reduce or stop their business with us. ***Negative reputational incidents could adversely affect our business and results of operations, including through lost sales, loss of new store and development***

> **opportunities, or team member retention and recruiting difficulties.**

(Emphasis added).

88.    The 2021 10-K was signed by Defendants Cornell and Fiddelke in their capacity as CEO and CFO, respectively, and was accompanied by certifications from Defendants Cornell and Fiddelke pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (the "**SOX Certifications**"), attesting to the accuracy of the filing. Defendant Fiddelke also signed the 2021 10-K as power of attorney on behalf of Defendants Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Minnick, Rice, and Stockton.

89.    The statements in the 2021 10-K were also incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 27, 2022, August 6, 2022, and November 23, 2022, with each report stating that "[t]here have been no material changes to the risk factors described" in the 2021 10-K. These quarterly reports were also accompanied by SOX Certifications from Defendants Cornell and Fiddelke.

90.    On April 25, 2022, Target filed a Proxy Statement on Schedule 14A with the SEC (the "**2022 Proxy**"), which began with a letter to shareholders from Defendant Lozano that stated, in relevant part, "with the growing focus among stakeholders on how companies are addressing the risks and opportunities related to environmental, social, and governance (ESG) issues,

the Board revised its committee structure in 2021, clarifying and enhancing

our oversight of these matters."

91.    The 2022 Proxy described the Board's key role in risk oversight as

follows:

> **Risk oversight**
>
> Oversight of the various risks we face in implementing
> our strategy is an integral and continuous part of the
> Board's oversight of our business. The Board, each
> Committee, and management have specific roles and
> responsibilities with respect to those risks.
>
> **The Board and its Committees**
>
> The Board provides oversight of overall risks, with
> emphasis on strategic risks, which occurs as an
> integral and continuous part of the Board's oversight
> of our business and seeks to ensure that management
> has processes in place to appropriately manage risk.
> For example, our principal strategic risks are reviewed
> as part of the Board's regular discussion and
> consideration of our strategy, including the
> development and monitoring of specific initiatives and
> their overall alignment with our strategy. Similarly, at
> every meeting the Board reviews the principal factors
> influencing our operating results, including the
> competitive environment, and discusses with our
> senior executive officers the major events, activities,
> and challenges affecting Target.
>
> The Audit & Risk Committee oversees our enterprise
> risk management program and periodically reviews
> our approach to risk identification, assessment, and
> mitigation strategies with the Board to facilitate
> coordination with the activities of the Board and other
> Committees. The Chief Legal & Risk Officer provides
> the Audit & Risk Committee with regular updates on
> the enterprise risk management program and the

status of key risks facing the business. The Audit &
Risk Committee also regularly receives updates on key
risk areas from other members of management with
primary responsibility for managing those risk areas,
and regularly reviews legal and regulatory risk,
compliance, and ethics matters.

92. Furthermore, the 2022 Proxy contained a section on

"Sustainability & ESG," which stated, in relevant part:

We engage with a diverse group of stakeholders
around the world, including the people who
manufacture the products we sell, the Team Members
who welcome our guests, the communities where we
work, the nonprofits that work with us, and the
investors who make our work possible. ***Their
perspectives are on of a variety of factors we
consider as we analyze which ESG matters to
prioritize in determining and evaluating our
sustainability strategy***.

(emphasis added).

93. The 2022 Proxy also emphasized the significance of "ESG matters"

to the Board's risk oversight, and described the specific oversight and

responsibilities of each Committee through the following graphic:



94.    Although the 2022 Proxy was clear that the full Board, the Audit
& Risk Committee, and the Governance & Sustainability Committee were all
responsible for oversight of various "ESG matters," only the Governance &
Sustainability Committee was described as overseeing "social" and "political"
issues and risks:

| Responsible party | Oversight areas for ESG matters |
| --- | --- |
| Board | • Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>• Top ESG risks<br>• Reputation management<br>• Crisis management and response<br>• Organizational team health |
| Audit & Risk Committee | • Compliance and ethics<br>• Supply chain ESG, including vendor human capital and responsible sourcing practices<br>• Cybersecurity and information security<br>• Privacy<br>• Product and food safety |

| Responsible party | Oversight areas for ESG matters |
| --- | --- |
| Governance & Sustainability Committee | • Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br>• Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)<br>• Social and political issues and risks not allocated to other Committees<br>• Philanthropy and community engagement<br>• Policies and practices regarding public policy and political activities |
| Compensation & Human Capital Management Committee | • DE&I<br>• Culture and employee engagement<br>• Pay equity<br>• Broad-based compensation and benefits<br>• Growth and development<br>• Purpose and values |

95.    The Sustainability & ESG section of the 2022 Proxy Statement also directed shareholders to the Company's "annual  Corporate Responsibility Report," where "we report ESG matters [and] which has extensive information on specific ESG topics." The Company's 2022 Environmental, Social and Governance Report, which was publicly posted on Target's website, stated that "the Governance & Sustainability Committee of our Board is charged with overseeing our policies and practices regarding public policy advocacy and political activities."

96.    The 2022 Proxy also contained materially false and misleading statements regarding the Company's reasons for adopting its various ESG and DEI initiatives. Specifically, the 2022 Proxy stated that the Board "maintain[s] flexibility to determine which leadership structure best serves the interests of Target and our shareholders."

97.    The 2022 Proxy also claimed that the most important priority for the Company's capital allocation was to "fully invest in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets."

98.    These statements, coupled with the statements regarding the Company's ESG and DEI initiatives and risk oversight, would lead a reasonable shareholder to believe that every action the Company was taking,

including with respect to ESG and DEI initiatives, would be in the best interests of shareholders and would increase shareholder value.

99.   Moreover, the 2022 Proxy falsely indicated that executive compensation was structured to align with maximizing shareholder value, stating in relevant part:

> Our compensation programs are structured to align the interests of our executive officers with the interests of our shareholders. They are designed to attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace, and to provide a framework that encourages outstanding financial results and shareholder returns over the long term. Shareholders are urged to read the CD&A, which discusses in-depth how our executive compensation programs are aligned with our performance and the creation of shareholder value.

100.   These statements would lead a reasonable shareholder to believe that the Company's executive compensation plans were aligned with advancing shareholder value, as measured by financial performance. In reality, however, Target's executive compensation plans were tied to executives' achievement of DEI goals that were often harmful to shareholder value.

101.   For instance, the 2022 Proxy indicates that bonuses are tied to "team scorecards." In an entirely different section of the 2022 Proxy, the 2021 team scorecard assessment notes "[p]ositive progress on three-year enterprise

DE&I goals [and] [w]e met our exceeded our ambitious goals for representation, advancement, and experience."

102.    This explanation of what was included in the "team scorecard" reveals that executive compensation plans were, at least in part, tied to the Company meeting certain DEI goals. As established herein, however, the DEI initiatives were not actually implemented by the Company in order to maximize shareholder value, rendering Target's statements about executive compensation in the 2022 Proxy materially false and misleading.

103.    On March 8, 2023, the Company filed its Annual Report on Form 10-K with the SEC (the "**2022 10-K**"), purporting to disclose "the material risks" faced by Target. Unlike the 2021 10-K, however, the 2022 10-K did ***not*** address the risk of reputational harm in connection with the Company's ESG and/or DEI initiatives. Instead, the 2022 10-K indicated that there was a risk to the Company if it failed to "achieve" its "goals and initiatives" with regard to ESG and DEI matters stating, in relevant part, as follows:

> **Our continued success is dependent on positive perceptions of Target which, if eroded, could adversely affect our business and our relationships with our guests and team members.**
>
> We believe that one of the reasons our shareholders, guests, team members, and vendors choose Target is the positive reputation we have built over many years for serving those constituencies and the communities in which we operate. To be successful in the future, we

must continue to preserve Target's reputation. Our reputation is largely based on perceptions. It may be difficult to address negative publicity across media channels, regardless of whether it is accurate. ***Negative incidents involving us, our workforce, or others with whom we do business could quickly erode trust and confidence and result in consumer boycotts, workforce unrest or walkouts, government investigations, and litigation. Negative reputational incidents or negative perceptions of us could adversely affect our business and results of operations, including through lower sales, the termination of business relationships, loss of new store and development opportunities, and team member retention and recruiting difficulties.***

In addition, stakeholder expectations regarding environmental, social, and governance matters continue to evolve and are not uniform. We have established, and may continue to establish, various goals and initiatives on these matters, including with respect to diversity, equity, and inclusion topics. We cannot guarantee that we will achieve these goals and initiatives. ***Any failure, or perceived failure, by us to achieve these goals and initiatives or to otherwise meet evolving and varied stakeholder expectations could adversely affect our reputation and result in legal and regulatory proceedings against us.*** Any of these outcomes could negatively impact our results of operations and financial condition.

(emphasis added).

104.   The 2022 10-K was signed by Defendants Cornell and Fiddelke in their capacity as CEO and CFO, respectively, who also signed SOX Certifications attesting to the accuracy of the filing. Defendant Fiddelke also signed the 2022 10-K as power of attorney on behalf of Defendants Abney,

Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Puma, Rice, and Stockton.

105.    The statements in the 2022 10-K were also incorporated by reference into Target's quarterly reports on Form 10-Q filed with the SEC on May 26, 2023, and August 25, 2023, with each report stating that "[t]here have been no material changes to the risk factors" described in the 2022 10-K. These quarterly reports were also accompanied by SOX Certifications from Defendants Cornell and Fiddelke.

106.    On May 1, 2023, the Company filed a Proxy Statement on Schedule 14A with the SEC (the "**2023 Proxy**"), which described the Board's key role in risk oversight in nearly identical terms as those used in the 2022 Proxy:

> **Risk oversight**
>
> Oversight of the various risks we face in implementing our strategy is an integral and continuous part of the Board's oversight of our business. The Board, each Committee, and management have specific roles and responsibilities with respect to those risks.
>
> **The Board and its Committees**
>
> The Board provides oversight of overall risks and seeks to ensure that our Leadership Team has processes in place to appropriately manage risk. Strategic risks are emphasized within that overall risk oversight responsibility because they are an integral and ongoing part of the Board's oversight of our business. For example, our principal strategic risks are reviewed as part of the Board's regular discussion and consideration of our strategy, including the development and monitoring of specific initiatives and

their overall alignment with our strategy. Similarly, at every meeting the Board reviews the principal factors influencing our operating results, including the competitive environment, and discusses with our Leadership Team the major events, activities, and challenges affecting Target.

107.   The 2023 Proxy also emphasized the significance of "ESG matters" to the Board's risk oversight, and described the Board's allocation of oversight of those matters throughout the Board and its committees as follows:

### Sustainability & ESG

We engage with a diverse group of stakeholders around the world, including the people who manufacture the products we sell, the Team Members who welcome our guests, the communities where we work, the nonprofits that work with us, and the investors who make our work possible. Their perspectives are one of a variety of factors we consider as we analyze which ESG matters to prioritize in determining and evaluating our sustainability strategy….

108.   According to the 2023 Proxy, in order to account for "the breadth of ESG matters for a company of [Target's] size and scale," oversight of "ESG matters" was "allocated throughout the Board and its Committees" as follows:

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Board | • Sustainability and ESG strategy (through oversight of our business strategy and annual strategic priorities)<br>• Sustainability and ESG risks (through oversight of our business strategy and top enterprise risks)<br>• Reputation management<br>• Crisis management and response<br>• Organizational team health |
| Audit & Risk Committee | • Compliance and ethics<br>• Supply chain ESG matters, including vendor human capital and responsible sourcing practices<br>• Cybersecurity and information security<br>• Privacy<br>• Product and food safety |

| Responsible party | Oversight areas for ESG matters |
|---|---|
| Governance & Sustainability Committee | • Overall approach to significant sustainability and ESG matters (including strategy, prioritization, monitoring, and external reporting)<br>• Environmental stewardship practices (including climate and energy, waste, natural resources, and chemicals)<br>• Social and political issues and risks not allocated to other Committees<br>• Philanthropy and community engagement<br>• Policies and practices regarding public policy advocacy and political activities |
| Compensation & Human Capital Management Committee | • DE&I<br>• Culture and Team Member engagement<br>• Pay equity<br>• Broad-based compensation and benefits<br>• Growth and development<br>• Purpose and values |

109.  The Sustainability & ESG section of the 2023 Proxy Statement also directed shareholders to the Company's annual Sustainability and Governance Report, posted publicly on Target's website, which stated, in relevant part, that "our Board of Directors Governance & Sustainability Committee oversees our policies and practices regarding public policy advocacy and political activities."

110.  In addition, the 2023 Proxy contained false and misleading statements that the Board was acting to advance shareholder interests when it made decisions about DEI and ESG initiatives:

> The Board has a fiduciary duty to act as it believes to be in the best interests of Target and its shareholders. To meet that duty, the Board believes it is important to maintain the flexibility to determine which Board leadership structure best serves those interests as Target's needs and circumstances evolve.

111.  The 2023 Proxy also falsely assured shareholders that the most important priority for the Company's capital allocation was to "fully invest in opportunities to profitably grow our business, create sustainable long-term value, and maintain our current operations and assets."

46

112. Finally, the 2023 Proxy represented that Target's executive compensation plans aligned executives' incentive compensation with maximizing shareholder value when, in fact, the plans were designed to incentivize executives to further the Company's DEI and ESG mandates.

113. The 2023 Proxy outlined Target's "Executive compensation guiding principles," stating as follows:

> We believe executive compensation should be directly linked to performance and long-term value creation for our shareholders. With that in mind, three principles guide our compensation program:
>
> - Deliver on our pay for performance philosophy in support of our strategy.
>
> - Provide a framework that encourages outstanding financial results and shareholder returns over the long-term.
>
> - Attract, retain, and motivate a premier management team to sustain our distinctive brand and its competitive advantage in the marketplace.
>
> A significant portion of our executive compensation is at risk, so the actual compensation realized by our NEOs may vary from targeted compensation based upon the level of achievement of specified performance objectives and stock price performance.

114. Target also attested that its executive compensation plans "align with our pay for performance philosophy and are structured based on financial and operational performance and shareholder outcomes."

115.  These statements would lead a reasonable shareholder to believe that the Company's executive compensation plans were aligned with advancing shareholder value, as measured by the Company's financial performance. In reality, however, Target's executive compensation plans were based on its executives satisfying DEI and ESG goals, which, as detailed herein, did not actually maximize shareholder value but, to the contrary, resulted in the evaporation of billions of dollars in market capitalization.

116.  A footnote in the 2023 Proxy explained that Target's executive compensation included a component ambiguously labeled "STIP" (an acronym the 2023 Proxy never defines, but which stand for "Short Term Incentive Plan"). The 2023 Proxy indicated that "STIP" represents a significant portion of executives' annual compensation, and noted that "[p]ayouts range from 0% to 200% of goal depending on Sales, Incentive Operating Income, and the assessment of the team scorecard."

117.  Buried several pages later, the 2023 Proxy described that the "team scorecard component of the STIP…emphasized the business outcomes we expect from the execution of strategic priorities." Those priorities, or "specific team scorecard progress indicators," included that executives "advance[d] progress on our new three-year enterprise DE&I goals." Target's DEI goals were not directly mentioned in the guidelines for executive

compensation, rendering Target's representation that its executive compensation was aligned with shareholder value misleading.

118.  The statements contained in the 2022 10-K, the 2022 Proxy, the 2023 10-K, and the 2023 Proxy were materially false and misleading because they failed to disclose the risk of consumer backlash to the Company's ESG and DEI initiatives, including but not limited to Target's Pride Month campaigns – notwithstanding that management had firsthand experience with such backlash damaging the Company. Among other things, the Company failed to disclose the risk of widespread boycotts and the financial damage to the Company that could result therefrom. The statements above were also materially false and misleading because the Board and its committees were not properly overseeing ESG risks or "political and social risks," as demonstrated by the severe backlash resulting from the 2023 Pride Campaign.

**Target's 2023 Pride Campaign Provokes Swift and Dramatic Backlash**

119.  In May 2023, immediately after publishing the false and misleading 2023 Proxy and despite the backlash received from both sides of the political spectrum in previous years, Target embarked upon the most prominent and extensive Pride Month campaign in the Company's history.

120.  The 2023 Pride Month collection included more than 2,000 products, including gender fluid mugs, queer all year calendars, and books for

children aged 2-8 titled *Bye Bye, Binary*, *Pride 1,2,3* and *I'm not a girl*.[50] Other controversial products included a slogan sweater with the words "cure transphobia not trans people" and a tote bag that said, "too queer for here."[51]

121.    Target's website listed over 100 products under the category "LGBT Pride: Kids' Clothing" and the Company's brick-and-mortar stores offered a wide array of LGBTQIA+ merchandise in the children's section.

122.    Other merchandise promoted as part of its Pride Month campaign included "Satanist-Inspired" clothing and accessories and extra-extra-small "swimsuits with clothing tags that describe the items as having a 'light binding effect' on breasts and 'tuck-friendly construction' for male genitalia" with "extra crotch coverage."[52]

123.    Upon releasing the 2023 Pride Campaign in stores, the backlash started immediately, with many consumers calling for a boycott of Target.[53] Consumers expressed outrage particularly over the merchandise targeted at children, uploading videos online of Target merchandise they found offensive.[54]

---

[50] Meyersohn, *supra*.

[51] Cavale, *supra*.

[52] *Id.*

[53] Abigail Anthony, *Target Sheds $9 Billion in Market Cap Amid Backlash Over 'PRIDE' Collection*, Nat'l Rev. (May 25, 2023), https://www.nationalreview.com/news/target-sheds-9-billion-in-market-cap-amid-backlash-over-pride-collection/.

[54] Ariel Zilber, *Target's 'Tuck-Friendly' Swimwear for Kids Sparks Outcry: 'Bud Light 2.0,'* N.Y. Post (May 19, 2023), https://nypost.com/2023/05/19/targets-tuck-friendly-swimwear-for-kids-sparks-controversy/.

One account responded to the 2023 Pride Campaign by saying "it is highly inappropriate and disturbing. We hope there are enough parents out there that understand how wrong this is and show them that this garbage will not sell," while another said "Target deserves the Bud Light treatment. We will work to put pressure on them."[55]

124. By May 24, 2023, videos on TikTok with the hashtag '#boycotttarget' had attracted nearly 25 million views. Ultimately, consumer backlash prompted the largest boycott against Target in its history, leading to billions of dollars in investor losses.[56]

125. On May 17, 2023, prior to the complete disclosure of the 2023 Pride Campaign-related consumer backlash, Target's stock price traded at around $160.96. News reports have indicated that Target lost *at least $10 billion* in market valuation between May 18, 2023, and May 28, 2023, due to consumer outrage over the 2023 Pride Month campaign.[57] By October 6, 2023, Target's market capitalization had decreased by more than $25 billion, with its stock price hitting a low of $105.01 per share. Over two years later, the Company's stock price has still not recovered to its pre-campaign level; as of Friday, July 25, 2025, it trades at just $106.05 per share.

---

[55] *Id.* The "Bud Light treatment" refers to the consumer boycott of Bud Light starting in April 2023, discussed *infra*.

[56] Anthony, *supra*.

[57] Reyes, *supra*.

126. On June 1, 2023, JPMorgan downgraded Target's stock, citing "recent company controversies" as part of the explanation for turning "Target's traffic negative after an impressive run of 12 consecutive positive quarters."[58] Wells Fargo analysts said the 2023 Pride Campaign "'generated a meaningful amount of negative in-store and social media attention' that adds uncertainty to its already challenged near-term prospects and may be hurting store traffic."[59]

127. Target also claimed that its employees were experiencing threats while at work due to outrage over the 2023 Pride Campaign.[60]

128. At first, the Company doubled down on its 2023 Pride Campaign. On May 17, 2023, when asked about the backlash in an interview, Defendant Cornell defended the Company's DEI and ESG initiatives and the 2023 Pride Campaign stating, in relevant part, "I think those are just good business decisions, and it's the right thing for society, and it's the great thing for our brand."[61]

---

[58] James Rogers, *Target's Stock, on its Longest Losing Streak in 23 Years, Downgraded at JPMorgan*, MarketWatch (June 1, 2023), https://www.marketwatch.com/story/targets-stock-on-its-longest-losing-streak-in-23-years-downgraded-at-jpmorgan-18860151.

[59] Daphne Howard, *How Target Went from Loud and Proud – to Silent*, MarketingDive (June 7, 2023), https://www.marketingdive.com/news/target-pride-month-boycott-backlash/652283/#:~:text=Indeed%2C%20in%20a%20June%201,may%20be%20hurting%20store%20traffic.

[60] Anthony, *supra*.

[61] Ariel Zilber, *Target CEO Defends LGBTQ-Friendly Kids Clothing Amid Boycott Calls: 'The Right Thing for Society,'* N.Y. Post (May 23, 2023), https://nypost.com/2023/05/23/target-ceo-defends-

52

129.   Within weeks, however, Target began to backtrack on its 2023 Pride Campaign.

130.   On May 23, 2023, *Fox News* published an article in which a "Target insider" revealed that there were "emergency" calls held with managers and district senior directors where they were told by the Company to "tamp down" the Pride sections of stores immediately.[62] The insider said that they "were given 36 hours to take all of our Pride stuff, the entire section, and move it into a section that's a third the size. From the front of the store to the back of the store, you can't have anything on mannequins and no large signage."[63]

131.   The article went on, stating:

> The insider, who has worked at the retailer for almost two decades, said Target rarely makes such hasty decisions. They said Friday's call began with roughly 10 minutes on 'how to deal with team member safety' because of the amount of backlash the Pride merchandise has generated, noting that Target Asset Protect & Corporate Security teams were present on the call.[64]

---

woke-capitalism-in-face-of-boycott-calls/.

[62] Brian Flood, *Target Holds 'Emergency' Meeting Over LGBTQ Merchandise in Some Stores to Avoid 'Bud Light Situation,'* Fox News (May 23, 2023), https://www.foxnews.com/media/target-holds-emergency-meeting-lgbtq-pride-merchandise-stores-avoid-bud-light-situation.

[63] *Id.*

[64] *Id.*

132.    Then, on May 24, 2023, Target management issued the "Target Statement on 2023 Pride Collection," in which it both announced changes to its 2023 Pride Campaign due to consumer backlash and doubled down on its commitment to the cause:

> For more than a decade, Target has offered an assortment of products aimed at celebrating Pride Month. Since introducing this year's collection, we've experienced threats impacting our team members' sense of safety and well-being while at work. Given these volatile circumstances, we are making adjustment to our plans, including removing items that have been at the center of the most significant controversial behavior. Our focus now is on moving forward with our continuing commitment to the LGBTQIA+ community and standing with them as we celebrate Pride Month and throughout the year.[65]

133.    Just days after publishing this statement, Target expanded the number of stores pulling back Pride merchandise beyond just the stores purportedly receiving "threats" and also removed specific merchandise across the entire United States. According to a May 26, 2023 *Business Insider* article, "[e]mployee sources in six states" indicated that "the order came down on Thursday [*i.e.*, May 25, 2023] to stores across the US, less than a week after a similar directive to Target locations in Southern states where front-end Pride displays were taken down and moved to low-traffic areas of the store." The employees also stated that Target specifically stopped selling its line of

---

[65] *Target Statement on 2023 Pride Collection, supra.*

"transgender-friendly swimsuits,"[66] *i.e.,* the extra-extra-small "swimsuits advertising a 'light binding effect' on breasts and 'tuck-friendly construction' for male genitalia" with "extra crotch coverage."[67]

134.    Although much of the backlash that Target received came from the right, the Company's decision to scale back the 2023 Pride Campaign also resulted in critiques from the left, with many saying the decision highlighted the problem of "rainbow capitalism."[68] A transgender designer stated that "it's a very dangerous precedent to set, that if people just get riled up enough about the products you're selling, you can completely distance yourself from the LGBT community, when and if it's convenient."[69]

135.    Additionally, Bob Witeck, the president of an organization that specializes in LGBTQIA+ related communications, stated that Target's decision to backtrack "amounts to walking away from its own previously stated values, suggesting hypocrisy and risking rejection from all corners."[70]

---

[66] Dominick Reuter, *Target is Expanding Removal of Pride Merchandise Across the Country, Workers Say, in Potential Win for LGBTQ-Protestors*, Bus. Insider (May 26, 2023), https://www.businessinsider.com/target-reportedly-expands-removal-of-pride-merchandise-nationwide-2023-5

[67] Cavale, *supra.*

[68] Helen Reid, *Target Pride Backlash Exposes 'Rainbow Capitalism' Problem, Designer Says,* Yahoo! Fin. (May 31, 2023), https://finance.yahoo.com/news/target-pride-backlash-exposes-rainbow-080342807.html.

[69] *Id.*

[70] Howard, *supra.*

136.   On August 16, 2023, Target issued a press release reporting its earnings for the second quarter of 2023, which included the months of May, June, and July during which the 2023 Pride Campaign occurred. Target reported that its comparable sales fell for the first time in six years, with in-store sales dropping 4.3% and online sales dropping 10.5% during the quarter.

137.   During the accompanying earnings call hosted by the Company that same day, Target's Chief Growth Officer, A. Christina Hennington, called "the strong reaction to this year's Pride assortment" a "headwind" that negatively affected earnings. Also during the earnings call, Defendant Fiddelke stated, in relevant part:

> ***Total revenue was down 4.9% in the second quarter. Total sales also decreased by that same amount while other revenue grew 1.3%.*** Within other revenue, we continue to see strong growth from our Roundel ad business, which offset declines in credit card profit sharing and other small income items compared with last year. ***Comparable sales were down 5.4% in Q2, reflecting a 4.8% decline in traffic.***
>
> Among the factors affecting our top line performance, comps and discretionary categories continue to reflect challenging trends in the industry, which softened further in Q2. A second factor was lower inflation in food, beverages and essentials as we compare to over peak inflation a year ago. ***Furthermore, traffic and top line trends were affected by the reaction to our Pride assortment, which launched in the middle of May.*** And lastly, our results reflected the comparison over last year's clearance and promotional activity, which affected weekly comp trends in certain

categories, particularly in the digital channel. While
each of these factors played a role in the quarter, it's
not possible to reliably quantify the separate impact of
each one.

(Emphasis added).

138.    Following the news of the Company's decreased earnings, Target's

stock closed at $128.75 on August 16, 2023, a drop of $32.21 per share, or

approximately 20%, from the closing price on May 17, 2023.

139.    On November 15, 2023, Target issued a press release reporting its

earnings for the third quarter of 2023, noting that comparable sales continued

to fall, declining 4.9% for the quarter, with in-store comparable sales declining

by 4.6% and digital comparable sales falling 6%.

140.    In an interview with CNBC that same month, when asked about

the 2023 Pride Campaign, Defendant Cornell admitted that Target exposed

itself to consumer backlash because "we set the presentation earlier than

everyone else" by beginning in May, and because the display "was very

prominent."[71] He stated that Target would "manage these moments… very

differently" going forward, including "curat[ing] our assortment much more

---

[71] *CNBC Transcript: Target CEO Brian Cornell Speaks with Becky Quick from the CNBC Evolve Global
Summit*, CNBC (Nov. 2, 2023), https://www.cnbc.com/2023/11/02/cnbc-transcript-target-ceo-
brian-cornell-speaks-with-becky-quick-from-the-cnbc-evolve-global-summit.html

carefully" and presenting Pride merchandise so that it is not "the first thing you see in our store" but rather is presented "appropriately."[72]

### The Company's Hypocrisy Regarding DEI Causes Lasting Damage

141.   Rather than adjusting its strategies in the face of dramatic customer backlash, Target again launched a Pride Month campaign in 2024. On May 31, 2024, the Company issued a press release stating that it was "celebrating during Pride Month and throughout the year."[73]

142.   On November 20, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024, which was filed with the SEC as an attachment to a Form 8-K (the "**3Q24 Earnings Release**"), wherein Target announced that its GAAP-adjusted earnings per share were $1.85, compared with $2.10 in the same quarter of 2023, a decline of 11.9%. The Company also reported disappointing guidance, including "approximately flat comparable sales." This news caused the price of Target's stock to drop precipitously, from a close of $156 per share on November 19, 2024, to a close of $121.72 on November 20, 2024, a decline of 22%.

---

[72] *Id.*

[73] *Target Shares Plans for Pride 2024, Including Team and Community Support, and Product Assortment*, Target (May 31, 2024), https://corporate.target.com/press/fact-sheet/2024/05/pride-month-2024.

143.    Pivoting again, Target phased out many long-term DEI initiatives
in January 2025, claiming that the move was based on "many years of data,
insights, listening and learning," including an effort to stay "in step with the
evolving external landscape."[74]

144.    Just days after the announcement, foot traffic at Target stores
began to decrease. Since the week of January 27, 2025, Target's foot traffic
reportedly declined for at least 10 straight weeks compared to the previous
year.[75]

145.    On March 4, 2025, Target issued a press release announcing its
financial results for the fourth quarter and full year of 2024, which was filed
as an attachment to a Form 8-K with the SEC, wherein the Company gave
weak guidance for the first quarter of 2025 and said it expected sales to grow
just 1% for the full year.

146.    By May 2025, however, Target had reduced its full-year sales
forecast. In the Company's press release reporting its earnings for the first
quarter of 2025, issued on May 21, 2025, and filed with the SEC as an
attachment to a Form 8-K, Defendant Cornell blamed declining sales, in part,

---

[74] Siddharth Cavale, *Target Ending DEI Initiatives Amid Trump's Order on Diversity Programs*,
Reuters (Jan. 24, 2025), https://www.reuters.com/business/retail-consumer/target-ends-its-3-
year-diversity-equity-inclusion-initiatives-2025-01-24/.

[75] *See* Andrew Adam Newman, *Target's Foot Traffic Fell for the Fourth Month in a Row—and It's
'Going to Continue to Snowball,' Reputation Analytics Firm Says*, Fortune (June 13, 2025),
https://fortune.com/2025/06/13/target-foot-traffic-dei-reputation/.

on backlash to rolling back DEI initiatives, which prompted boycotts by customers who viewed it as a betrayal of Target's previous commitments to DEI and ESG. In the press release, the Company reported a nearly 3% drop in sales in the first quarter compared to the previous year, with comparable sales down 3.8%. Target also adjusted its projected earnings per share to $7 to $9, from an earlier forecast of $8.80 to $9.80.

147.    This news caused the price of Target's stock to drop $5.19 per share, or approximately 5.3%, from a close of $98.12 per share on May 20, 2025, to a close of $93.01 on May 21, 2025.

148.    Target continues to face criticism from both sides of the political spectrum, with conservatives arguing that Target gave into progressive ideology, while progressives and DEI advocates accuse the Company of betraying its commitments.

### The Individual Defendants Knew, or Should Have Known, the Risks of the 2023 Pride Campaign

149.    As detailed above, Target faced backlash due to its numerous LGBTQIA+ initiatives from 2014 up until 2023 when the 2023 Pride Campaign was launched. As such, the risk of a campaign of this magnitude was well known to the Company. The Individual Defendants, as members of the Board and responsible officers of the Company, were, or should have been, informed

of adverse consumer reaction to the Company's previous LGBTQIA+ initiatives.

150. Furthermore, numerous other large companies experienced similar public backlash for a variety of DEI initiatives, which the Individual Defendants were, or should have been, aware of. For instance, in April 2023, just weeks before Target launched its 2023 Pride Campaign, Anheuser-Busch partnered with a transgender influencer, Dylan Mulvaney, for a promotion campaign for Bud Light.[76] This resulted in a massive consumer boycott of Bud Light and other products made by Anheuser-Busch Inbev SA; by May 2023, Bud Light had lost its status as the top-selling beer in the United States – a spot that it had held for 20 years – and Anheuser-Busch's stock price had dropped by almost 20%.[77]

---

[76] Emily Stewart, *The Bud Light Boycott, Explained as Much as is Possible*, Vox (last updated Jun. 30, 2023), https://www.vox.com/money/2023/4/12/23680135/bud-light-boycott-dylan-mulvaney-travis-tritt-trans.

[77] Christina Cheddar Berk, *Boycotts Hit Stocks Hard. Here's What Might be Next for Bud, Target, and Others Caught in the Anti-Pride Backlash* (June 3, 2023), CNBC.com, https://www.cnbc.com/2023/06/03/anti-pride-backlash-what-target-anheuser-busch-and-others-should-expect-next-.html

151. There were other DEI and ESG initiatives over the past decade that should have been cautionary tales for Target, including Hershey's[78] and Jack Daniel's,[79] among many others.

152. As such, the Individual Defendants knew, or should have known, that the Company's DEI and ESG initiatives, and the 2023 Pride Campaign specifically, posed significant risks to the Company.

153. Indeed, on December 4, 2024, this Court entered an order denying defendants' motion to dismiss the *Craig* securities action. The decision stated, in relevant part, that: (i) the plaintiffs properly alleged that "Target knew the risks of their upcoming 2023 Pride Month Campaign and failed to craft a tailored disclosure;" (ii) the facts in the plaintiffs' amended complaint regarding past instances of backlash demonstrate that it is plausible that the Board knew, or should have known that a new and more aggressive Pride Month campaign posed a risk of backlash and financial repercussions, and that it was plausible t hat the risk disclosures issued by the Company were

---

[78] *See* Michael Bartiromo, *Hershey Responds to Backlash Over Women's Day Campaign Featuring Trans Activist,* News Nation (Mar. 3, 2023), https://www.newsnationnow.com/nmw/hershey-responds-to-backlash-over-womens-day-campaign-featuring-trans-activist/ (consumers called for a boycott of Hershey after Hershey Canada announced that it was releasing limited-edition chocolate bars featuring the likeness of five Canadian women, one of which was a trans women).

[79] *See* Aleks Phillips, *Jack Daniels Faces Boycott Calls Over LGBT Campaign: 'Lost a Loyal Drinker,'* Newsweek (Apr. 6, 2023), https://www.newsweek.com/jack-daniels-whiskey-boycott-calls-lgbt-campaign-1792890 (Jack Daniel's removed its "small town, big pride" campaign, which teamed up with drag queens to promote the liquor, from its website after many boycotted the products).

knowingly false; and (iii) the plaintiffs "have pleaded that the 2022 and 2023 proxy statements contained at least one false, misleading, statement or omission [regarding risk oversight]."[80]

### The Individual Defendants Cause the Company to Repurchase Stock at Inflated Prices

154.  According to the Company's public filings, while the price of Target stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase approximately 12.6 million shares of its own stock, for a total of roughly $2.6 billion, during the first and second quarters of 2022. Specifically, the Company made the following repurchases of stock:

| Time Period | Number of Shares Repurchased | Average Price Per Share | Total Investment |
|---|---|---|---|
| Three Months Ended April 30, 2022 | 100,000 | $208.60 | $10,000,000 |
| Three Months Ended July 31, 2022 | 12,500,000 | $211.58 | $2,644,750,000 |

155.  Given that the price of Target common stock was $128.75 after the corrective disclosures on August 17, 2023, the true value of the 12.6 million repurchased shares was roughly $1.6 billion. Accordingly, the Individual

---

[80] *Craig*, ECF No. 102 at 13, 20, 23-24.

Defendants caused the Company to overpay by approximately $1 billion to repurchase these shares during the first and second quarters of 2022.

156.   Moreover, in the three months ended August 3, 2024, before the Company issued the 3Q24 Earnings Release and revealed its disappointing financial results, the Company repurchased an additional 1.1 million shares of its own stock, while the price of Target stock was artificially inflated, at an average price of $145.94 per share, for a total of roughly $155 million. Given that the price of Target common stock was $121.72 per share on November 20, 2024 following the 3Q24 Earnings Release, the true value of the repurchased shares was roughly $133.8 million. Accordingly, the Individual Defendants caused Target to overpay by approximately $21.2 million to repurchase these shares.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

157.   By reason of their positions as directors and officers of the Company, each of the Individual Defendants owed, and continues to owe, Target and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and must use his or her utmost ability to control and manage Target in a fair, just, honest, and equitable manner. The Individual Defendants must act in furtherance of the best interests of Target and its stockholders to benefit all stockholders equally and not in furtherance of any other interest or benefit.

158.    Each Individual Defendant owed, and if applicable, continues to
owe, Target and its stockholders the fiduciary duty to exercise good faith and
diligence in the administration of the affairs of the Company and in the use
and preservation of its property and assets.

159.    The Individual Defendants, because of their positions of control
and authority as directors and/or officers of Target, were able to, and did,
directly and/or indirectly, exercise control over the wrongful acts complained
of herein. Because of their fiduciary positions with Target, each of the
Individual Defendants had knowledge of material, nonpublic information
regarding the Company.

160.    In addition, as officers and/or directors of a publicly-traded
company, the common stock of which was registered with the SEC pursuant to
the Exchange Act and traded on the NYSE, the Individual Defendants had a
duty to prevent and not to effect the dissemination of inaccurate and
untruthful information with respect to the Company's financial condition,
performance, growth, financial statements, products, management, internal
controls, earnings, and present and future business prospects, including the
dissemination of false and/or materially misleading information regarding the
Company's business, prospects, and operations, and had a duty to cause the
Company to disclose in its regulatory filings with the SEC all those facts
described in this pleading that it failed to disclose, so that the market price of

the Company's common stock would be based upon truthful, accurate, and fairly presented information.

161.    To discharge their duties, the Individual Defendants must exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants must, among other things:

a.    Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

b.    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of the United States and each state in which it operates, and pursuant to Target's own Corporate Governance Guidelines;

c.    Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

d.    Remain informed as to how Target conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection

therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

e.      Establish and maintain systematic and accurate records and reports of the business and internal affairs of Target and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

f.      Maintain and implement an adequate and functioning system of internal, legal, financial, and management controls, such that Target's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

g.      Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

h.      Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts

67

concerning, *inter alia*, each of the subjects and duties set forth above;
and

i.    Truthfully and accurately guide investors and analysts as to
the business operations of the Company at any given time.

162.    The Individual Defendants, because of their fiduciary positions of
control and authority, were able to and did, directly or indirectly, exercise
control over the wrongful acts complained of herein, as well as the contents of
the various public statements issued by Target. Moreover, because of their
fiduciary positions with Target, each of the Individual Defendants had access
to adverse, non-public information about the Company.

163.    At all times relevant hereto, the Individual Defendants were the
agents of each other and of Target and were at all times acting within the
course and scope of such agency.

## **Duties Pursuant to the Team Member Code of Ethics**

164.    The Officer Defendants, as executive officers of Target, were bound
by Target's Team Member Code of Ethics. As stated on Target's website, "[l]ike
all team members, [the Company's] executive leaders follow Target's Team
Member Code of Ethics."[81]

---

[81] *See Code of Ethics*, Target, https://corporate.target.com/sustainability-governance/operating-
ethically/code-of-ethics (last visited Jul. 24, 2025).

165. The Team Member Code of Ethics begins with a message from Target's CEO and a section titled, "defining ethics at Target," which states, in relevant part: "Target's commitment to ethical standards is reflected in the way we conduct business and through our actions. As team members, at any level, we must always consider the impact on our guests, team members, stakeholders, community and the Target brand when making business decisions."

166. Under the section titled "be truthful in marketing and advertising," the Team Member Code of Ethics claims that, in promoting Target's business, its team members "communicate accurately and honestly." The section goes on to state: "[O]ur guests make decisions about where they'll shop and what they'll buy based on what they see in stores, online or what they learn about us. We have an obligation in our promotions, advertising and guest communications to follow all laws and provide guests with accurate information."

167. The Team Member Code of Ethics also contains a section titled "provide accurate financial information," which states, in relevant part:

> The U.S. Securities and Exchange Commission and other governing bodies have strict rules about the accuracy of our financial statements and disclosures and the strength of our internal controls over financial reporting. Our financial and operational records must remain accurate, so we can make sound business

decisions, keep our operations running efficiently and meet our goals and obligations….

As team members, we have an obligation to follow all internal control procedures to maintain our financial records – this includes submitting an expense report, reviewing or approving financials and handling any other business record. Accurate recordkeeping helps us provide complete, accurate, timely and understandable information in our public disclosures.

168. Under a section titled "communicate responsibly," the Team Member Code of Ethics states, in relevant part:

As team members, we love our Company and enjoy talking about it – to each other and everyone. We designate authorized individuals who are trained to speak on behalf of Target because we can damage our reputation in just a few words with an untrue statement….

Our reputation is one of our greatest assets, and it's up to each team member to protect it. We refer all outside inquiries about Target's business to our Enterprise Communications team to ensure that all information conveyed to the public, regulatory authority and others is accurate, complete and consistent….

If your work authorizes you to communicate with or respond to government or regulatory entities, it's important to be accurate. Anything you say or report to these entities should be accurate, complete and consistent. Never mislead, provide incorrect information or omit important details.

169. The Team Member Code of Ethics also contains a section titled "engage responsibly in political activities," which states:

> The Government Affairs team works to make sure that
> Target has a voice in decisions made by government
> officials. Target also encourages team members to
> participate in the civic process….
>
> When you engage in advocacy on behalf of Target, you
> must always follow the policies and laws that apply.
> You must also keep your personal political activities
> separate from your role at Target.

170.    At all relevant times, Defendants Cornell and Fiddelke, as officers

of the Company, were required to abide by the Team Member Code of Ethics.

## Duties Pursuant to the Governance & Sustainability Committee Charter

171.    In addition to these duties, Defendants Baker, Barrett, Healey,

Leahy, Lozano, and Stockton, who served on the Governance & Sustainability

Committee at all relevant times, owed specific duties to Target pursuant to the

Governance & Sustainability Charter, which clearly outlined the Committee's

responsibilities with regard to oversight of ESG and political and social risk,

as follows:

> **ESG & Corporate Responsibility Matters.**
> Oversee the Corporation's overall approach to
> environmental, social & governance and corporate
> responsibility matters, including:
>
>                    * * *
>
> - identification of the ESG-related topics that are
>   most relevant and important to the Corporation
>   and any goals or aspirations related thereto;
>
>                    * * *

- social and political issues and risks impacting
  the Corporation (other than the human capital
  matters overseen by the Compensation &
  Human Capital Management Committee and
  the supply chain matters overseen by the Audit
  & Risk Committee);

- the Corporation's philanthropy and community
  engagement activities;

- external reporting on ESG and corporate
  responsibility matters.

  **Public Advocacy and Political Activities.** Oversee
  the Corporation's policies and practices regarding
  public policy advocacy and political activities,
  including the process for selecting issues for
  engagement, lobbying activities, political
  contributions with corporate funds (including support
  of other organizations that may engage in political
  activity), and the activities of any political action
  committee organized by the Corporation.

172. As described by the charter, the Governance & Sustainability
Committee's oversight responsibility for "social and political issues and risks
impacting the Corporation" is distinct from the Committee's other
responsibilities, including the Committee's oversight of the "identification of
ESG-related topics," "philanthropy and community engagement," and even
"public advocacy and political activities."

173. Moreover, the charter indicates that the Governance &
Sustainability Committee's oversight responsibility for "social and political
issues and risks impacting the Corporation" is also distinct from "human
capital matters overseen by the Compensation & Human Capital Management

Committee" and "supply chain matters overseen by the Audit & Risk

Committee."

### Duties Pursuant to the Audit & Risk Committee Charter

174. In addition to complying with the Director Code of Ethics,

Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton (the

"**Audit Committee Defendants**"), who served on the Audit & Risk

Committee at all relevant times, owed specific duties to Target pursuant to the

Audit & Risk Committee Charter, which described the "function" of the

Committee as follows:

> Assist the Board of Directors in overseeing (i) the
> integrity of the Corporation's financial statements; (ii)
> the independence, qualifications and performance of
> the Corporation's independent auditor; (iii) the
> performance of the Corporation's internal audit
> function; (iv) the Corporation's compliance and ethics
> programs; and (vi) the Corporation's enterprise risk
> management program.

175. The "Responsibilities" section of the Audit & Risk Committee

Charter outlines the responsibilities of the Audit & Risk Committee, in

relevant part, as follows:

### A. Accounting and Reporting

1. **Review of Earnings Releases and Other
Information.** Review and discuss with management
the Corporation's earnings press releases, including
the use of non-GAAP financial measures and any
earnings guidance provided, before issuance. Discuss
generally the types of financial information provided

and the types of presentations to be made to analysts and rating agencies (such discussion need not occur prior to each disclosure).

**2. <u>Review of Annual and Quarterly Reports.</u>** Review and discuss with management and the independent auditors the Corporation's interim unaudited and annual audited financial statements, including disclosures made in management's discussion and analysis, the results of the independent auditor's review (or audit in the case of annual financial statements) and any other matters required to be communicated to the Committee by the independent auditor, prior to filing each Form 10-Q or 10K, respectively. Recommend to the Board whether the audited financial statements should be included with the Corporation's Form 10-K. The Committee shall also prepare the "Report of Audit Committee" contained in the annual Proxy Statement.

**3. <u>Internal Controls.</u>** Receive information from management about any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting. Review and discuss with management and the independent auditor, the report of management on internal control over financial reporting and the independent auditor's report on internal control over financial reporting prior to the filing of the Corporation's Form 10-K.

**4. <u>General Oversight.</u>** Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Corporation's financial statements, including any significant changes in the Corporation's selection or application of accounting principles and any critical accounting estimates made in the course of preparing the financial statements.

\* \* \*

**F. Oversight of Enterprise Risk Management**

1.  **Enterprise Risk Management Program.**
Oversee the Corporation's enterprise risk
management program to obtain an understanding of
the primary enterprise risks facing the Corporation,
including:

- management's process for identifying and
  assessing risks and, where appropriate,
  employing strategies for risk mitigation; and

- the budget and staffing for the Corporation's
  enterprise risk management function.

2.  **Principal Business and Operational Risks.**
Oversee the principal business and operational risks
facing the Corporation, including:

- vendor risk management

- cybersecurity and information security

- privacy

- product safety, including food safety

- business continuity and disaster recovery.

3.  **Coordination of Risk Oversight.** Periodically
review the Corporation's approach to risk
identification, assessment and mitigation strategies
with the Board to facilitate coordination with the
activities of the Board and the other Board
Committees.

* * *

**H. Other**

* * *

5.  **Reporting to the Board.** Provide the Board with
regular reports of the activities of the Committee.

## BREACHES OF DUTIES

176.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Target, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

177.   The Individual Defendants breached their fiduciary duties by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders.

178.   The Audit Committee Defendants had a duty to review the Company's earnings, press releases, and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Target's public statements and internal control functions.

179.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of Target, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now a defendant in the Securities Class Action, the three component cases of which allege

violations of federal securities laws. As a result, Target has expended, and will continue to expend, significant sums of money.

## DAMAGES TO TARGET

### The Securities Class Action

180.   On November 28, 2023, an amended complaint was filed in the *Craig* securities action against the Company and Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Puma, Rice, and Stockton. The amended complaint alleges violations of Sections 10(b) and 14(a) of the Exchange Act, and SEC Rules 10b-5 and 14a-9.

181.   As detailed above, on December 4, 2024, this Court entered an order denying defendants' motion to dismiss the *Craig* securities action and the parties are now entering discovery. As such, the Individual Defendants have subjected the Company to the significant cost of defending itself through an unsuccessful motion to dismiss and the Company will continue to incur significant sums in relation to the *Craig* securities action and any liability or settlement that results.

182.   Subsequently, two securities class actions were filed in this Court, captioned *City of Riviera Beach Police Pension Fund v. Target Corporation, et al.*, No. 2:25-cv-00085 (M.D. Fla.) and *State Board of Administration of Florida v. Target Corporation, et al.*, No. 2:25-cv-00135 (M.D. Fla.).

183.   On July 24, 2025, this Court consolidated these three securities actions into the single consolidated Securities Class Action. The Company will therefore continue to expend substantial amounts in defending itself for the foreseeable future and remains exposed to potentially billions of dollars in class-wide liability.

### Unjust Compensation

184.   At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company, as detailed *supra*.

185.   Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated.

186.   However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the

compensation they received during the period of wrongdoing was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

### **Share Repurchases**

187. As detailed above, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, causing the Company to overpay for its own common stock by approximately $1 billion.

### **Additional Damage to the Company**

188. As a direct and proximate result of the Individual Defendants' misconduct, Target has suffered economic damage in the form of decreases in sales and a precipitous drop in the Company's price, as well as the continuing expenditure of significant sums of money to defend itself and its officers and directors in the Securities Class Action.

189. Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action and its three component actions filed against the Company for violations of the federal securities laws. Target will incur additional expenditures and economic harm due to, among other things, amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

190.   Moreover, the Securities Class Action has exposed Target to potentially billions of dollars in class-wide liability.

191.   As a direct and proximate result of the Individual Defendants' misconduct, Target has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

192.   Plaintiffs repeat and re-allege each and every allegation above as though fully set forth herein.

193.   Plaintiffs bring this action derivatively in the right and for the benefit of Target to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Target, unjust enrichment, and violations of the Exchange Act.

194.   Target is named solely as a nominal party in this action. This is not a collusive action and to confer jurisdiction on the Court that it would not otherwise have.

195.   Plaintiffs are, and have been continuously at all relevant times, stockholders of Target. Plaintiffs will adequately and fairly represent the interests of Target in enforcing and prosecuting its rights, and, to that end,

have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

196.   A pre-suit demand on the Board of Target is futile and, therefore, excused. At the time that the first-filed constituent suit in this consolidated action was filed, the Board consisted of 12 directors: Current Director Defendants (i) Cornell; (ii) Abney; (iii) Baker; (iv) Barrett; (v) Boudreaux; (vi) Edwards; (vii) Knauss; (viii) Leahy; (ix) Lozano; (x) Puma; (xi) Rice; and (xii) Stockton.

197.   Plaintiffs did not make a demand on the Board prior to bringing their respective stockholder derivative suits because, as set forth below, a majority of the Board is disabled from exercising its disinterested, good faith business judgment in considering whether to bring the claims in this action or approving the establishment of an independent special committee pursuant to Section 302A.241, subdivision 1, of the Minnesota Business Corporation Act (the "**SLC Statute**") .

## **Demand is Excused Because the Entire Board Faces a Substantial Likelihood of Liability**

198.   Demand is excused as to the entire Board, because all of the Current Director Defendants breached their fiduciary duties of loyalty by making false and misleading statements about the risk of consumer backlash, boycotts, and financial damage related to Target's ESG and DEI initiatives and

failing to adequately oversee these ESG and DEI initiatives and the Company's related disclosures.

199.   For example, the 2022 Proxy and 2023 Proxy, which were solicited by Director Defendants Cornell, Abney, Baker, Barrett, Boudreaux, Edwards, Knauss, Leahy, Lozano, Puma,[82] Rice, and Stockton, represented that the Board and its committees were adequately overseeing ESG and DEI risks, including "social and political issues and risks," and that such initiatives were aligned with maximizing shareholder value. These statements were false and misleading, as evidenced by the repeated failures in oversight that led to consumer boycotts and billions in losses from the 2023 Pride Campaign, the scaled-back 2024 and 2025 Pride collections (which drew further backlash from LGBTQIA+ advocates and designers for being "pathetic" and "confusing"), and the January 2025 decision to phase out DEI and ESG programs amid an "evolving external landscape." The latter decision triggered immediate backlash from DEI and ESG activists, calls for national boycotts, a 40-day consumer strike, negative social media floods, and ongoing sales declines, including a 3% drop in first-quarter 2025 sales, 10 consecutive weeks of reduced foot traffic starting in late January 2025, and a reduced full-year sales forecast partly attributed to DEI and ESG-related backlash.

---

[82] Defendant Puma did not solicit the 2022 Proxy as she was elected to the Board on August 10, 2022.

200.    Moreover, the 2021 10-K and the 2022 10-K, which, as detailed above, each contained materially false and misleading statements, were signed by Defendant Cornell and by Defendants Abney, Baker, Barrett, Boudreaux, Edwards, Healey, Knauss, Leahy, Lozano, Rice, and Stockton, through a power of attorney.

201.    Each of the Current Director Defendants knew or should have known of the false and misleading statements that were made on the Company's behalf and took no steps in a good faith effort to prevent the statements from being issued and/or correct the statements once they had been made. Instead, each of the Current Director Defendants authorized and/or permitted the false and misleading statements described herein to be distributed to shareholders and, as such, could not fairly prosecute this action even if they initiated it.

202.    Moreover, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton, as members of the Audit & Risk Committee, reviewed and approved the false and misleading statements issued by the Company. The Audit & Risk Committee Charter provides that it is responsible for the integrity of the Company's financial statements, compliance with legal and regulatory requirements, and oversight of the enterprise risk management program, including principal business and operational risks. Thus, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton were responsible for

knowingly or recklessly allowing the issuance of the false and misleading statements regarding the risk of consumer backlash, boycotts, and resulting financial damage to the Company related to Target's ESG and DEI initiatives, including the failures in 2024 and 2025 that exacerbated reputational harm and led to further sales declines and boycotts.

203. Accordingly, Defendants Abney, Boudreaux, Edwards, Puma, Rice, and Stockton breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein and face a substantial likelihood of liability for their breaches of fiduciary duties, rendering demand upon them futile.

204. In addition, Defendants Baker, Barrett, Leahy, Lozano, and Stockton, as members of the Governance & Sustainability Committee, failed to adequately oversee social and political risks stemming from Target's ESG and DEI initiatives, as required by the Governance & Sustainability Charter. This failure is evident in the Board's decisions to scale back Target's Pride merchandise in 2024 and 2025 (drawing accusations of "rainbow capitalism" and betrayal from LGBTQIA+ designers and advocates) and to abruptly end DEI and ESG programs in January 2025, which provoked widespread backlash, boycotts, and financial harm, including a reported $15.7 billion market value loss.

205.   Accordingly, Defendants Baker, Barrett, Leahy, Lozano, and Stockton breached their fiduciary duty because they participated in the wrongdoing described herein and face a substantial likelihood of liability for their breaches of fiduciary duties, making any demand upon them futile.

206.   Furthermore, each of the Current Director Defendants is named as defendants in the *Craig* action, which has survived a motion to dismiss, and the Securities Class Action, which expose the Company to potential class-wide liability. Accordingly, for these additional reasons, each of the Individual Defendants faces a substantial likelihood of liability for the misconduct alleged herein, and demand is excused as futile.

**Demand is Further Excused Because Defendant Cornell
Lacks Independence and is Incapable of Considering a Demand**

207.   Defendant Cornell's principal professional occupation is his employment with Target, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Defendant Cornell has served as the Company's Chairman and CEO since 2014 and, during the 2023 fiscal year, Defendant Cornell received $19,203,353 in total compensation from the Company. Accordingly, Cornell lacks independence from the other members of the Board due to his interest in maintaining his executive position at Target, as well as the substantial compensation he receives therefrom. This lack of independence renders

Defendant Cornell incapable of impartially considering a demand to vigorously prosecute this action.

208.   Moreover, as CEO, Defendant Cornell had the power and authority to control the contents of the Company's financial filings, press releases, and other market communications. He attested to being involved in the preparation and delivery of the Company's SEC filings alleged herein to be misleading and had the ability to have them corrected and/or prevent their release.[83] Defendant Cornell knew or recklessly disregarded the facts regarding the risk of the Company's 2023 Pride Campaign and the high likelihood that this would result in consumer backlash, boycotts, and financial damage to the Company, as described herein.

209.   Also, as CEO of Target, Defendant Cornell fails the NYSE bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Cornell could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Cornell is therefore futile.

---

[83]Defendant Cornell signed the 2021 10-K, the 2022 10-K, and the quarterly reports on Form 10-Q filed with the SEC on May 27, 2022, August 6, 2022, November 23, 2022, May 26, 2023, and August 25, 2023. Additionally, each of these SEC filings were accompanied by a SOX Certification made by Defendant Cornell, wherein he attested to the accuracy of the filings.

**Demand is Further Excused Because Defendants**
**Boudreaux, Leahy, and Knauss are Conflicted**

210.   Defendants Boudreaux, Leahy, and Knauss are each irreconcilably conflicted and cannot consider a demand to sue the Individual Defendants because they each have personal and professional relationships which preclude them from being able to exercise independent and objective judgment.

211.   Specifically: (1) Defendant Boudreaux serves as President & CEO of Elevance Health, Inc., from which Target obtained the wellness services that previously comprised the Company's Team Member life resources program; (2) Defendant Leahy serves as President & CEO of CDW Corporation, from which Target purchased supplies, merchandise, equipment, software, servicing, repairs, and maintenance; and (3) Defendant Knauss' son represented a supplier in its relationship with Target during fiscal 2023, from which Target purchased over $15 million worth of merchandise in fiscal 2023 and approximately $12 million in 2024.

212.  Accordingly, Defendants Boudreaux, Leahy, and Knauss are unlikely to consider a demand and take action against the Individual Defendants which, in turn, could have an adverse impact on their above-referenced personal and professional relationships.

## Additional Reasons Excusing Demand

213.  The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby. It is thus apparent that the Current Director Defendants have no intention of prosecuting these claims against the defendants herein.

214.  The Company, at all material times, had its corporate governance policies, including the Director Code of Ethics, which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct. The Current Director Defendants' breaches of their duty of loyalty are reason to doubt that they can exercise their disinterested, good faith business judgment to consider bringing the claims herein.

215.  The Current Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their

positions of control and the prerequisites thereof and are incapable of exercising good faith, disinterested business judgment in deciding whether to bring this action.

216.   The Current Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Current Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As all of the Current Director Defendants face a substantial likelihood of liability, they are self-interested in the conduct challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company.  Accordingly, demand is excused as futile.

217.   Publicly traded companies, such as Target, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue one another to recover the Company's damages. If no such insurance is carried, then the Current Director Defendants will not cause the Company to sue the Individual Defendants

named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is excused as futile.

218.    Accordingly, each of the Current Director Defendants, and at least a majority of them, cannot consider a demand to bring the claims in this action with the requisite disinterestedness, good faith, and independence. Accordingly, demand upon the Current Director Defendants is futile and, thus, excused.

219.    Additionally and alternatively, demand is excused because there is no possibility that the Board would respond to a litigation demand. In addition to each of the reasons above, taking any action with respect to a demand to bring the claims herein invites further customer backlash and boycotts, causing additional damage to the Company. A decision by the Board to bring the claims herein invites backlash and boycotts from DEI and ESG activists and the LGBTQIA+ community. Conversely, a decision by the Board not to bring the claims herein invites backlash and boycotts from customer who oppose the Company's DEI and ESG activities as described herein. Indeed, customers from both sides of the political spectrum have already boycotted the Company in response to both its promotion and rescission of its DEI and ESG activities (including the 2023 Pride Campaign). As such, the Company and its public stockholders have no road to redress except through this stockholder derivative action.

## THE BOARD IS DISABLED FROM APPOINTING
## A SPECIAL COMMITTEE

220.   Plaintiffs repeat and re-allege each and every allegation above as though fully set forth herein.

221.   The Minnesota SLC Statute provides that "[a] resolution approved by the affirmative vote of a majority of the directors currently in office may establish committees… [which] may include a special litigation committee[.]" For the same reasons that demand is excused as futile, a majority of the Board is incapable of exercising its disinterested, good faith business judgment to establish a special litigation committee to independently consider whether to bring the claims asserted herein.   Indeed, the fact that the Board has not appointed a special litigation committee in the face of at least six actions concerning the misconduct alleged herein underscores the Board's interestedness and lack of independence with respect to either a litigation demand or the formation of a special litigation committee.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

222.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

223.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or

knowing conduct by or on behalf of the Individual Defendants. The Section

14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiffs

specifically disclaim any allegations of, reliance upon any allegation of, or

reference to any allegation of fraud, scienter, or recklessness with regard to

these non-fraud claims.

224.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides

that:

> It shall be unlawful for any person, by use of the mails or by any
> means or instrumentality of interstate commerce or of any facility
> of a national securities exchange or otherwise, in contravention of
> such rules and regulations as the [SEC] may prescribe as
> necessary or appropriate in the public interest or for the protection
> of investors, to solicit or to permit the use of his name to solicit any
> proxy or consent or authorization in respect of any security (other
> than an exempted security) registered pursuant to section 12 of
> this title [15 U.S.C. § 78l].

225.   Rule 14a-9, promulgated pursuant to Section 14(a) of the

Exchange Act, provides that no proxy statement shall contain "any statement

which, at the time and in the light of the circumstances under which it is made,

is false or misleading with respect to any material fact, or which omits to state

any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. § 240.14a-9.

226.   In the exercise of reasonable care, the Individual Defendants

should have known that, by misrepresenting or failing to disclose the foregoing

material facts, the statements contained in the 2022 Proxy and 2023 Proxy

were materially false and misleading. As alleged above, the 2022 Proxy and 2023 Proxy were materially false and misleading because they assured investors that Target's Board and committees were adequately overseeing ESG and DEI risks, including "social and political issues and risks," and that such initiatives were aligned with maximizing shareholder value. However, in reality, repeated failures in oversight led to consumer boycotts and billions in losses from the 2023 Pride Campaign, the scaled-back 2024 and 2025 Pride collections (which drew further backlash from DEI and ESG activists and the LGBTQIA+ community), and the January 2025 decision to phase out DEI and ESG programs amid an "evolving external landscape."

227.   The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for stockholder determination in the 2022 Proxy and 2023 Proxy, including, but not limited to, election of directors, the ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

228.   The false and misleading elements of the 2022 Proxy and 2023 Proxy led to the re-election of the Individual Defendants, allowing them to breach their fiduciary duties to Target  and caused economic harm cognizable under Section 14(a) in this derivative action.

229.   First, the proxies facilitated the re-election of directors who approved the 2023 Pride Campaign, resulting in immediate boycotts and a $10

billion market capitalization drop within days, escalating to $25 billion by
year-end. This harm compounded with scaled-back DEI efforts in 2024–2025,
including the January 2025 phase-out, which provoked further boycotts, a 3.8%
Q1 sales decline, 40% reduced foot traffic, and an additional $12.4–$15.7 billion
market value erosion amid lowered earnings forecasts.

230. Second, the proxies misleading statements exposed Target to
securities class actions and derivative suits, generating millions in defense
costs and potential settlements, constituting corporate waste.

231. Finally, by tying executive pay to DEI goals without risk
disclosure, the proxies led to unjust enrichment, with executives receiving
excessive compensation amid these multibillion-dollar losses.

232. Plaintiffs, on behalf of Target, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 10(b) of the Exchange Act
and Rule 10b-5*

233. Plaintiffs incorporate by reference and re-allege each and every
allegation set forth above as though fully set forth herein.

234. As detailed herein, the Individual Defendants disseminated and/or
approved public statements that failed to disclose the above-referenced
truthful facts and, as a result of the foregoing, the Individual Defendants'
public statements were materially false and misleading at all relevant times.

Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant harm to the Company.

235.  As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Target, their control over, and/or receipt and/or modification of Target's materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Target, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

236.  The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The foregoing misconduct could not have

been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

237. The Individual Defendants were each members of Target's Board of Directors and senior management team during the aforesaid time period. Based on their roles at Target, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

238. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Target, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

239. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information

alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

240.   As such, the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

241.   As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

242.   Plaintiffs, on behalf of Target, have no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

243.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

244.   The Individual Defendants, by virtue of their positions with Target and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Target and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Target to engage in the illegal conduct and practices complained of herein.

245.   Plaintiffs, on behalf of Target, have no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants**
*for Breaches of Fiduciary Duties*

246.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

247.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Target's business and affairs as directors and/or officers of the Company.

248.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

249.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties owed to the

Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Target without regard to other considerations.

250. The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

251. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

252. The Individual Defendants had actual or constructive knowledge that internal controls concerning the Company's DEI and ESG initiatives and public disclosures concerning the foregoing were not adequately maintained; failed to exercise their duty to adequately oversee the management and

operation of the Company, caused the Company to make the false and misleading statements alleged herein, and failed to cause the Company to correct the aforementioned false and misleading statements.

253.    The Audit Committee Defendants breached their duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

254.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Target has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to Target.

255.    Plaintiffs, on behalf of Target, have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants
*for Aiding and Abetting Breach of Fiduciary Duty*

256.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

257.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engaged in the ultra vires and illegal conduct complained of herein.

258.   Plaintiffs, on behalf of Target, have no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants
*for Waste of Corporate Assets*

259.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

260.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing, as detailed herein.. It resulted in continuous, connected, and ongoing harm to the Company.

261.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; (ii) losing billions of dollars in profits and valuation as a result of the 2023 Pride Month campaign; (iii) causing Target to

repurchase over one billion dollars in Company stock at artificially inflated prices; (iv) incurring likely millions of dollars in legal costs, including defending against the Securities Class Action and the constituent cases therein; and (v) potentially incurring billions of dollars in corporate liability for the misconduct alleged therein and herein.

262.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

263.  Plaintiffs, on behalf of Target, have no adequate remedy at law.

## SEVENTH CLAIM

### Against the Individual Defendants
*for Unjust Enrichment*

264.  Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

265.  By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of Target.

266.  The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Target tied to the performance or artificially inflated

valuation of Target, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

267.    Plaintiffs, as stockholders and a representatives of Target, seek restitution from the Individual Defendants and an order from this Court disgorging all profits—including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

268.    Plaintiffs, on behalf of Target, have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of Target and that Plaintiffs are adequate representatives of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile and/or that the Board is disabled from exercising its disinterested and good faith business judgment in deciding whether to appoint a special litigation committee;

C.    Finding that the Individual Defendants have breached Sections 14(a), 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder;

D.     Finding that the Individual Defendants have breached their fiduciary duties to Target;

E.     Finding that the Individual Defendants aided and abetted one another's breaches of their fiduciary duties;

F.     Finding that the Individual Defendants wasted corporate assets;

G.     Finding that the Individual Defendants have been unjustly enriched;

H.     Determining and awarding to Target the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

I.     Directing Target to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Target and its stockholders from a repeat of the damaging events described herein;

J.     Awarding Target equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of the Individual Defendants' trading activities or their other assets so as to assure that Plaintiff, on behalf of Target, has an effective remedy;

K.    Awarding Target restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

L.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees and experts' fees, costs, and expenses; and

M.    Granting such other and further relief as the Court may deem just and proper.

Dated: July 30, 2025

**COOK LAW, P.A.**

*/s/ William J. Cook*
William J. Cook
610 East Zack Street, Suite 505
Tampa, FL  33602
(813) 489-1001

*Liaison Counsel for Plaintiffs*

**RIGRODKSY LAW, P.A.**
Seth D. Rigrodsky (*pro hac vice*)
Vincent A. Licata (*pro hac vice*)
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
(516) 683-3516
sdr@rl-legal.com
vl@rl-legal.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole (*pro hac vice*)
Daniel Tepper (*pro hac vice*)
Correy A. Suk (*pro hac vice*)
33 Whitehall Street, 27th Floor
New York, NY 10004
(212) 363-7500
dtepper@zlk.com

csuk@zlk.com
gnespole@zlk.com

*Co-Lead Counsel for Plaintiffs*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (*pro hac vice*)
Gregory M. Egleston (*pro hac vice*
forthcoming)
260 Madison Avenue, 22nd Floor
New York, NY 10016
(212) 983-1300
tjmckenna@gme-law.com
egleston@gme-law.com

*Additional Counsel for Plaintiffs*

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Facsimile: (267) 507-6048
jgrabar@grabarlaw.com

*Additional Counsel for Plaintiff Portia
E. McCollum*